OPINION BY
STEVENS, P.J.E.:
Appellant Rafik Stiles appeals from the judgment of. sentence of an aggregate term of forty (40) years to life imprisonment entered in the Court of Common Pleas of Philadelphia'County on April 28, 2015, following a jury trial and his convictions of two counts of first-degree murder and two counts of violation of the uniform firearms act (VUFA).[1] Upon our review of the record, we affirm.
*971 The trial court detailed the relevant facts herein as follows:

FACTS

Murder of Kyle Featherstone, CP-51CR-0001997-2013

[Appellant] Rafik (“Hooter”) Stiles was convicted of first degree murder for the shooting death of Kyle Featherstone [Featherstone] (age 16), which occurred just before midnight on July 4, 2010, near the 3400 block of Spring Garden Street in Philadelphia.
Katrina Session [Session] gave a statement to detectives on July 23, 2010, wherein she stated that she was present when her [Appellant] brother shot and killed Featherstone. N.T. 10/17/14 at pp. 66-67. She denied giving the statement at trial.
Session stated in that statement that she went to see the 4th of July fireworks at the Art Museum with [Appellant], their brother Randall Stiles, and some friends. After the fireworks, Session was holding onto her friend “Reek’s” arm. Id. at pp. 67-68. A boy whom she did not know walked up to her and grabbed her by the other arm. The boy said to Reek, “[W]hy are you gritting on me? ... [.] [Y]ou don’t know who I’m down here with ...” The boy let go of Session’s arm and went across the street to his group of his friends on the corner of 31st and Spring Garden Street. Id. at pp. 70-74.
Session and Reek separated. Reek walked across 31st Street on Spring Garden. Session stated that once Reek passed the boy and his friends, they started running after Reek. Session stated: “They were running on Spring Garden Street towards 33rd Street. That’s when I heard the gunshots and everyone started running and that’s when I saw my brother, ‘Hooter’ shooting into the crowd. After the shooting, ‘Hooter’ ran towards 34th Street-.” Id. at pp. 74-75. She heard- approximately two to three gunshots.' Id. at pp. 76-77.
Lonnie -Burton testified that Feather-stone and he were walking with a group of boys near 31st and Spring Garden Street after the fireworks on July 4, 2010. ’ One of the boys they were with, whose name Burton did not know, “spoke to somebody’s girl” and talk of a fistfight spread through their group of friends. N.T. 10/20/14 at pp. 2-15. Burton testified that he did not know who they were going to fistfight or if it was more than one person. Id. at pp. 16-17, Burton, Featherstone, and four or five guys they were with ran approximately three blocks toward the location where they were going to fight when “somébody started shooting.” Id. at pp. 7, 16-17. Burton was shot in his hand. Id. at p. 3. He walked approximately ten feet, turned around, and saw Feather-stone lying in between two cars. Id. at pp. 8-9.
Joachim Fundenberg testified that he was walking and talking to females between 34th and 35th Street on Spring Garden when he heard. approximately four gunshots. N.T. 10/20/14 at pp. 119-21. He turned to run and was shot in the left shoulder. Id, at pp. 122. Fun-denberg testified that he was with Parrish Grantham [Grantham] at the fireworks, and that he did not know Kyle Featherstone or Lonnie Burton. Id. at p. 125.
Based on the testimony of Officer Daniel McGee and Officer Kyle Cross, the Court determined that Parrish Grantham was unavailable for court. Grantham’s testimony from the preliminary hearing was read into the record at trial. N.T; 10/22/14 at pp. 58-72.
*972 Grantham gave a statement to detectives on July 8, 2010, wherein he stated that he was present on July 4, 2010, when Featherstone was shot and killed. N.T. 10/22/14 at.p. 95., Grantham stated that his friend Kyle (not the decedent in this case) started talking to some girl who was with her boyfriend. Id. at p. 95. The girl’s boyfriend was “gritting” on Kyle, so Grantham started telling his friends, including Featherstone, that there may be a fight. Grantham, Feath-erstone, and Kyle walked towards the boyfriend, “another guy” and their group of friends. Grantham stated:
“The other guy saw us and he pulled out a gun. I just seen it in his hand and he started, shooting into our crowd. I ran towards 33rd Street and I stopped at 34th Street and I was hearing somebody got shot and I went back and I saw that it was Kyle [Featherstone].”
Id. at p. 96. Grantham stated that he saw Lonnie Burton had also been shot. Id. at p. 87. He knew Joachim (“Man-Man”) Fundenberg was there, but he did not see whether or not Fundenberg was injured that night. Id. at p. 89. Grantham described the shooter as approximately “6 foot, light skinned, thin build, a dark shirt and a tan bucket hat, between 20 and 18. He had no hair on his face.” Id. at pp. 97-98.
Grantham identified [Appellant] as the shooter in a photo array during his second statement taken more than two years after the shooting on October 10, 2012. He stated that he did not identify [Appellant] when detectives showed him photographs on a prior occasion because he “didn’t want to get involved” or “labeled a snitch.” Id. at pp. 101, 106-07, 111. However, Grantham again changed his story, testifying at the preliminary hearing that he never identified [Appellant] as the shooter and that he did not know who shot Featherstone. Id.
Zachary Neugent [Neugent] testified that [Appellant] and he were in placement together at the New Castle Youth Detention Center for approximately three months in 2010. [Appellant] and Neugent became close friends because they were from the same neighborhood and Neugent knew [Appellant’s] brother. N.T. 10/22/14 at pp. 4-7, 10-11.
Neugent gave a statement to homicide detectives on August 9, 2011. He stated that during those three months' at New Castle YDC, [Appellant] told him “about the 4th of July shooting and right after that, he told [him] about another shooting he did where he killed a lady.” Id. at p. 12. Neugent stated:
“He [Appellant] said that some words were exchanged between his sister with some guy, then the victim [Featherstone] put up his hands and was ready to fight and Rafik told me that he pulled out his gun and just started shooting that guy. He was telling me that he got away by jumping in a rented Charger and that he was wearing a Gucci bucket hat ... He said he shot the guy that had put up his hands. It wasn’t the same person who had words with his sister.”
Id. at pp. 15-16. [Appellant] told Neu-gent he shot Featherstone with a revolver. Id. at p. 20.
Officer Keya Mason testified that she responded to- a radio call reporting gunshots and a male down at 34th and Spring Garden Street just before midnight on July 4, 2010. N.T. 10/17/14 at pp. 48-50. When she arrived, responders were doing CPR on a young male lying on the sidewalk struggling to breathe. Id. at pp. 49-53
*973 Dr. Albert Chu, Assistant Medical Examiner, testified, that Featherstone was pronounced [dead] at 10:02 p.m. on July 5, 2010. N.T. 10/21/14 at p. 64. Featherstone had three perforating gunshot wounds: (1) one to the back of his head, which went into the left cerebellar hemisphere and the upper cerebral spinal cord near the brainstem and exited on his right check; (2) one to the left side of his back near his waistline, which went into his colon, stomach, and liver, and then exited on the front of his. abdomen; and (3) one to his right forearm. Id. at pp. 64-67. The cause of death was multiple gunshot wounds and the manner of death was homicide. Id. at p. 67.
William Whitehouse of the Crime Scene Unit testified that he collected three bullet specimens at 34th and Spring Garden Street on July 4, 2010. N.T. 10/20/14 at pp. 131-34.
Officer Kelly Walker of the Firearms Identification Unit .testified that all three bullet specimens were fired from the same firearm. N.T. 10/21/14 at pp. 86. Officer Walker testified that based on the series of lands and grooves, the bullet specimen recovered from the left breast of Barbara Crowder (see below) was fired from the same firearm as the three bullet specimens recovered from Featherstone’s crime scene. Id. at pp. 86-87. All four projectiles were identified as caliber .38 Special/.357 magnum. Id. at p. 91.

Murder of Barbara CTOwder, CP-51CR-0005681-2013.

Six days after he killed Featherstone, [Appellant] shot and killed Barbara Crowder [Crowder] (age 41) at approximately 2:30 a.m. on July 10, 2010, in front of 600 North 53rd Street.
Sapphia (“Brittany”). Pressley gave a statement to detectives on December 17, 2012, wherein she stated that she dated [Appellant] on-and-off for approximately three years. She denied giving the statement at trial. N.T. 10/21/14 at p. 3-4. Pressley conveyed to homicide detectives that she did not know Crowder, but that-she was present when Crowder was shot and killed. Id. at p. 13. She stated:
“I was on my friend’s porch. She lives on 53rd Street. Rafik was out there with some of his friends. I don’t know what happened. ' I just heard shots and I looked down the street and Rafik was shooting someone. I couldn’t tell who at that time. I saw the person laying [sic] on the ground after Rafik shot them and an old guy came running up to the person on the ground and started screaming for help. I ran in the house and was yelling they [sic] shooting.' They shooting, I found out later the person that' Rafik had shot was a woman.”
Id. at pp. 13-14. Pressley stated that [Appellant] told her that he shot Crowder “because she owed him something,” but he did not state what that “something” was. Id. at p. 17.
Bernard Lewis testified that he met Crowder approximately six months prior to the shooting. They were engaged. N.T., 10/20/14 at pp. 38-39, 42-43.
In a statement to detectives on July 10, 2010, Lewis stated that Crowder would get prescription pills like Xanax arid Percocet-from her doctor and sell them for money on the street. Id. at p. 44. Crowder went to “make a deal” with some guy on 53rd Street just prior to the shooting. Id. at pp. 44-45. Crowder told Lewis to wait for her on Girard Avenue.
*974 Crowder walked down 53rd Street and met up with a guy who was sitting on the steps of a house. Lewis described him as follows: “brown skin, clean shaven, brown khaki pants, a white T-shirt and a multicolored kangaroo hat. He was thin and about 6 to 12 inches taller than Barb [Crowder].” Id. at p. 47. Lewis identified [Appellant] as the person he saw Crowder meet up with in a photo array during his second statement on October 15, 2012. Id. at pp. 61-64, 82.
[Appellant] and Crowder walked down 53rd Street and seconds after they turned onto Poplar Street, Lewis heard a gunshot. Id. at pp. 39, 63. After he heard the gunshot, Lewis saw Crowder run to the corner, and fall. Id. He then saw [Appellant] and a shorter guy running on 53rd Street toward Wyalusing Avenue.
Shiheed Gaskins gave a statement to homicide detectives on December 30, 2011. N.T. 10/21/14 at pp. 95-97. He stated that he was living at 1215 North 53rd Street at the time of the shooting, and that his girlfriend and he had some friends over, including [Appellant], the [Appellant’s] girlfriend Sapphia (“Brittany”) Pressley, Randall Stiles, and Dar-ien Shirley. N.T. 10/21/14 at pp. 95-104, 124-25.
Gaskins stated that he was .in his house when he heard a gunshot. He then heard Pressley run into the house and scream, “Rafik shot somebody.” . Id. at p. 105. When Gaskins went to the front door, he saw [Appellant] biking away toward 53rd and Market Street. Id.
In addition to the details of Feather-stone’s murder, Zachary Neugent also conveyed to detectives what [Appellant] told him about Crowder’s murder. Neu-gent stated:
“[H]e was telling me that he was on 53rd Street when he shot the lady ... He was telling me that she said that she had peaches, which is Xanax and Percocets. He told me that he acted like he was gonna [sic] buy some and then he robbed her and he shot her. He said that he got away on a bike.”
N.T. 10/22/14 at pp. 30-31.
Dr. Albert Chu, Assistant Medical Examiner, testified that the cause of Crow-der’s death was a penetrating gunshot wound to the back. N.T. 10/21/14 at pp. 69, 72-73. The manner.of death was homicide. The bullet entered the far right side of her back approximately two inches below the shoulder and hit her spine and left lung. Id. at p. 70. The bullet was recovered in Crowder’s left breast. Id.
Officer'Kelly Walker of the Firearms Identification Unit testified that the bullet specimen recovered from Crowder’s breast and the three bullet specimens recovered from Featherstone’s crime scene were all fired from the samé firearm. N.T. 10/21/14 at pp. 86-87, 91
Trial Court Opinion, filed 10/6/15, at 2-9.
Following a hearing pursuant to Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012),[2] the trial court sentenced Appellant to forty (40) years to life in prison for the murder of Feather-stone and a concurrent term of forty (40) years to life in prison for the murder of Crowder. Appellant also received a concurrent sentence of two and one-half (2½) *975 years to five (5) years in prison for each VUFA conviction. Appellant filed a post sentence motion on May 6, 2015, and the trial court denied the motion the next day. Appellant filed a timely notice of appeal on May 26, 2015, and a statement of matters complained on appeal pursuant to Pa. R.A.P.1925(b) on July 14, 2015. He presents the following four issues for this Court’s review:
I. Whether the [c]ourt erred when it consolidated two unrelated murders into one jury trial[?]
II. Whether the [c]ourt erred when it denied [ J Appellant’s motion to suppress identification where the construction and display of the photo array were unduly suggestive and inherently unreliable[?]
III. Whether the adjudication of guilt is against the weight of the evidence and shocking to one’s sense of justice where there was an absence of detail, reliability and corroboration, where the witnesses lied to police in order to evade detection or to effectuate their release and where the photo displayed to witnesses did not resemble the way [ ] Appellant appeared at the time of the murders[?]
IV. Whether [ ] Appellant’s convictions are based upon insufficient evidence because the circumstantial inferences drawn from the evidence were unwarranted and unreliable and were in contravention to human experience[?]
Appellant’s Brief at 6.
Appellant first asserts the 'trial court erroneously consolidated the trials for the Featherstone and Crowder murders because the introduction of the ballistic evidence from the latter was more prejudicial than it was probative of whether Appellant had been properly identified in the former. Appellant reasons that had the cases been tried separately, the trial court would not have permitted evidence from the Crowder murder to be introduced in the Featherstone- murder trial. Appellant’s Brief at 24. In support of this assertion, Appellant posits the Commonwealth had tvyo eyewitnesses to establish the identity of the shooter in the> Featherstone murder, Session and Grantham, and the testimony of Neugent to whom Appellant had confessed his crimes. Appellant dismisses the Commonwealth’s argument that the testimony of Session and Grantham was of sufficiently poor quality such that there would be a question of identification in ‘ the Featherstone murder and argues that in light of their testimony, the identification evidence from the Crowder murder to bolster the identification of the shooter in the Featherstone murder was “cumulative and unnecessary.” Id. at 24-25. Appellant posits that as “[t]here was other evidence tending to prove idehtification in the Featherstone murder,” the trial court’s determination that both unrelated murders should be heard in a joint trial was an abuse of the court’s discretion. Id. at 25.
It is well settled that the decision of whether to join or sever offenses for trial is within the discretion of the trial court, and such decision will not be reversed on appeal absent a manifest abuse of that discretion or a showing of prejudice and clear injustice to the defendant. Commonwealth v. Wholaver, 605 Pa. 325, 351, 989 A.2d 883, 898 (2010). The Pennsylvania Rules' of Criminal Procedure provide that distinct' offenses which do not arise out of the same act or transaction may be tried together if the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion. Pa.R.Crim.P. 582(A)(1)(a).[3] While evidence concerning *976 distinct crimes is inadmissible solely to demonstrate a defendant’s bad character or his propensity to commit crimes, that evidence will be permitted to establish the identity of the perpetrator where proof of one crime tends to prove the others. Commonwealth v. Cousar, 593 Pa. 204, 225, 928 A.2d 1025, 1037 (2007).
In Commonwealth v. Reid, 533 Pa. 508, 626 A.2d 118 (1993), our Supreme Court considered the issue of whether evidence of one murder could be introduced during the trial of a separate murder where the ten-millimeter handgun that the defendant used in the second homicide also had been used in the first, for which he was on trial. Therein, the Commonwealth argued evidence that the defendant held the firearm at issue during the second incident tended to make it more probable that he was the individual who fired that same weapon in the first shooting, and our Supreme Court agreed. In doing so, the Court reasoned as follows:
Since the circumstances of the second murder ... place a weapon used in both murders in the hands of Reid at the time of the second murder, the question is whether a jury may draw an inference that Reid was the shooter in the first murder. Because empty shell casings from the same weapon were found at both murder scenes, and Reid was identified as the handgun shooter • in the second murder, in which a ten millimeter bullet was found in the victim’s head, evidence of the second murder is admissible to establish Reid’s identity as the shooter in the first.
Id. at 513, 626 A.2d at 121. The Court reached a similar conclusion in another matter wherein the same gun was used in two shootings that occurred several days apart. See Commonwealth v. Rollins, 525 Pa. 335, 580 A.2d 744 (1990) (finding evidence of a shooting that occurred three days after a murder was admissible to establish defendant’s identity).
In light of the foregoing, Appellant’s contention herein that testimony pertaining to the Crowder murder would have been inadmissible in the Featherstone trial is erroneous. Officer Kelly Walker of the Firearms Identification Unit related that three bullet fragments recovered from the scene of the Featherstone murder matched the bullet recovered from Crowder’s body and that they were fired from the same gun; therefore, the trial court observed that “[a]ny conclusion to be drawn by the jury concerning whether [Appellant] was the person who used that weapon to kill Featherstone would bear upon the identity of the individual who shot Crowder, and vice versa.” Trial Court Opinion, filed 10/6/15, at 11. The trial court concluded that:
[a]side from ballistics, the only evidence tending to show that [Appellant] was the shooter in Featherstone’s homicide was the statement of [Appellant’s] sister, Katrina Sessions [sic], who was uncooperative with the Commonwealth, and the statement of Parrish Grantham. Grantham gave a statement to detectives on July 8, 2010, in which he stated that he could not identify the shooter. He then identified [Appellant] as the shooter to homicide detectives more *977 than two years after the shooting in a statement on- October 10, 2010. However, Grantham recanted his identification at the preliminary hearing and was determined to be unavailable at the time of trial. Consequently, the crucial piece of evidence -linking [Appellant] to Feather-stone’s murder was the use of the same gun C.. Since the identification evidence in Featherstone was so weak and the ballistics in Featherstone’s case and Crowder’s case matched, the [c]ourt properly concluded that the probative value of [Appellant’s] connection to the murder weapon outweighed the danger of unfair prejudice caused by a joint trial. N.T. 08/04/14 at pp. 7-8.
Trial Court Opinion, filed 10/6/15, at 10-11.
Upon our review of the record, we agree that in light of the weaknesses in Session’s and Grantham’s testimony, as well as that of other Commonwealth witnesses, the fact the same gun had been used in both murders was relevant to a jury’s determination of whether Appellant shot and killed Featherstone. Indeed, it is this inconsistency in the pretrial statements and trial testimony of Commonwealth witnesses who identified Appellant as Featherstone’s killer upon which Appellant relies to support his claims his convictions were against the weight and sufficiency of the evidence. Appellant’s Brief at 6, 28-32. His argument at this juncture in his appellate brief to the contrary that such evidence “tended to prove” identification in the Feather-stone murder undermines and contradicts his later assertions therein that the witnesses’ testimony was completely incredible.
Moreover, Appellant has failed to establish he was prejudiced by the consolidation of the matters. See Wholaver, supra. The trial court specifically instructed the jury to consider each case separately, N.T., 10/23/14, at 118-20, and nowhere does Appellant claim the jury was unable to separate the evidence with respect to the two murders: Moreover, the murders occurred six days apart in different neighborhoods, and while Featherstone was a teenage male who was shot in a crowd of people at a Fourth of July party, Crowder was a forty-one woman who was killed following a robbery. As such, the crimes were easily. distinguishable by the jury. See Cousar, supra, 593 Pa. at 226, 928 A.2d at 1038 (no danger of jury-confusion where shooting incidents involved separate victims and different eyewitnesses and investigating officers).[4] Accordingly, no relief is due.
Next, Appellant contends the photographic array was unduly suggestive and that the trial court erred in failing to 'suppress the identifications made therefrom. Specifically, Appellant maintains police utilized a photograph of Appellant that had been taken' over a year after the murders wherein Appellant has facial hair and dreadlocks, although a police photograph taken two months after the niurders shows him as eyewitnesses had described him as being clean-shaven with short hair.[5] Appellant’s Brief at 26-27. Appellant reasons that “[b]y constructing a photo array with photos that did not match the physical descriptions given by each of the eyewitness homicide detective created an identification procedure likely to result in misidentification.” Id. at 27.
*978 Our standard of review of this issue is as follows:
When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court’s factual findings and whether- the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court’s conclusions of law are not binding on an appellate- court, whose duty it is to determine if the suppression court properly applied-the- law to the facts.
Whether an out of court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances. j Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but suggestiveness alone does not warrant exclusion. Identification evidence will not be suppressed unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to, a very substantial likelihood of irreparable misidentification. Photographs used, in line-ups are not unduly suggestive if the suspect’s picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics.
Commonwealth v. Fulmore, 25 A.3d 340, 346 (Pa.Super.2011) (internal citations and quotation marks omitted), Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. In re L.J., 622 Pa. 126, 148, 79 A.3d 1073, 1086 (2013).
At the outset, we note that although Appellant argues the photo array was unduly suggestive, he failed to ensure that the. certified record contained a copy of the photo array in question.
“A failure by [A]ppellant to insure that the original record certified for appeal contains sufficient information to conduct a proper review constitutes waiver of the issue sought to be examined.” Commonwealth v. Martz, 926 A.2d 514, 525 (Pa.Super.2007), appeal denied, 596 Pa. 704, 940 A.2d 363, (2008) (quoting Commonwealth v. Boyd, 451 Pa.Super. 404, 679 A.2d 1284, 1290 (1996), appeal denied, 547 Pa. 723, 689 A.2d 230 (1997) (quoting Smith v. Smith, 431 Pa.Super. 588, 637 A.2d 622, 623 (1993), allocatur denied, 539 Pa. 680, 652 A.2d 1325 (1994))). Because we have not been furnished with a copy of the photo array in question in the record, the issue challenging suppression of the photo array is deemed waived. Martz, 926 A.2d at 525 (citing Boyd, 679 A.2d at 1290).
Commonwealth v. Manley, 985 A.2d 256, 263-64 (Pa.Super.2009). Because our analysis of Appellant’s second issue requires a review of the photographic array, it is arguably waived; however, to the extent we may rely upon the trial court’s on-the-record-description thereof, we find this claim lacks merit.
Following the suppression hearing on October 16, 2014, Appellant argued the photographic array was unreliable because it did not depict Appellant as he looked in July of 2010. N.T., 10/16/14, at 225-26. In- response, the trial court indicated that it had reviewed the array and was constrained to discern what was suggestive about it in that each individual depicted *979 therein had dreadlocks. The trial court further indicated there was no record evidence of Appellant’s appearance in July 2010 and nothing to discount the possibility that he had dreadlocks at that time, shaved his head for the picture taken in September of 2010, and regrew his hair in 2011. Id. Ultimately, the trial court denied the motion to suppress and in doing so concluded:
[Appellant] has the same exact face, the same exact face in both pictures. His hair is shorter in one, dreadlocks in the other. There is no indication any witness ever said he had dreadlocks and the picture with dreadlocks was put into a photo array with all the young men with dreadlocks, plus both eyewitnesses stated that the perpetrator was wearing a hat, so you would never see his hair anyway. So they can only base it on his face, skin complexion, his.facial features and skin complexion, and he looks the same exact way to this Court.
So there is nothing suggestive about this photo array that this [c]ourt can see and this [c]ourt heard evidence and didn’t hear one thing out of the ordinary. ...
Id. at 228. The trial court also noted that Detective Gaul testified he had prepared the photo array that Grantham viewed. Detective Gaul placed Appellant’s picture from September 1, 2011, into a computer after which he clicked a button to retrieve similar photos and a computer-generated composite of similar photos was created. Id. at 228-29. Detective Lucke was directed to show the pre-prepared photographic array provided to him by Detective Verrecchio to a witness, Bernard Clinton Lewis, and he did so without saying anything to Mr. Lewis' who circled number 4, which was Appellant’s picture. Id. at 231.
In light of the foregoing, we disagree with Appellant’s reasoning that the Commonwealth “created an identification procedure likely to result in a misidentification.” Appellant’s Brief at 27. To the contrary, Appellant’s argument conflates undue suggestiveness of a photographic array with the weight to be afforded the identification at trial. See Commonwealth v. Fulmore, 25 A.3d 340, 347 (Pa.Super.2011) (finding differences between photographs included in array and witnesses’ description of the perpetrator relate to credibility of witnesses’ identification, not to undue suggestiveness of array) see also Commonwealth v. Sanders, 42 A.3d 325, 331 (Pa.Super.2012) (holding allegations the victim was not sufficiently lucid to make a pretrial identification go to the weight of the evidence and not to the admissibility of the identification).
An unduly suggestive photographic array would be one wherein Appellant’s photograph stood out as compared to the' others, an argument Appellant does not make. See Commonwealth v. Davis, 17 A.3d 390, 394 (Pa.Super.2011) (“Suggestiveness arises when the police employ an identification procedure that emphasizes or singles-out a suspect”). Indeed, the testimony at the suppression hearing revealed police conduct in the preparation and presentation of the photographic array to witnesses was not suggestive. Moreover, a depiction of Appellant with dreadlocks would more likely have proven beneficial to Appellant, for it would seem that an eyewitnesses would have greater difficulty identifying one whose appearance in a photographic array drastically differed from how he looked at the time of the incident.[6]
*980 In his third issue, Appellant challenges the weight of the evidence to sustain his convictions. Appellant posits the convictions are “shocking” because the Commonwealth’s witnesses were comprised of individuals who had admitted having lied to police and also lied in court. Following a brief synopsis of the witnesses’ testimony, Appellant urges that in light, of the “palpable absence of detail, reliability and corroboration” among them, the trial court abused its discretion in refusing to grant him a new trial. Appellant’s Brief at 29-31.
It is well settled that a defendant must present his challenge to the weight of the evidence to the trial court for.a review in the first instance. See Pa.R.Crim.P.. 607(A); Commonwealth v. Griffin, 65 A.3d 932, 939 (Pa.Super.2013). Thereafter, appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court’s determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court’s conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.
Commonwealth v. Widmer, 560 Pa. 308, 321-22, 744 A.2d 745, 753 (2000) (citations omitted).
Instantly, Appellant preserved his weight of the evidence challenge in a timely post sentence motion which the trial court denied; however, in its opinion filed pursuant to Pa.R.A.P.1925(a), the trial court, in the first instance, found Appellant had waived this issue for his failure to specify in his concise statement exactly which witnesses’ testimony and identifications he challenged. Trial Court Opinion, filed 10/6/15, at 12 (citing Commonwealth v. Hansley, 24 A.3d 410, 415 (Pa.Super.2011)). In the alternative,- the trial court found that the weight of the evidence supported the jury’s verdict and in doing so reasoned as follows:
The jury heard testimony that [Appellant’s] sister, Katrina Session, identified him as the person who shot Feather-stone, and that his girlfriend, Sapphia Pressley, identified him as the person who shot Crowder. The jury’s decision to credit their respective statements does not render the verdict contrary to the evidence presented. The weight of the evidence is a matter exclusively for the finder of fact who is free to believe all, part, or none of the evidence, and determine the credibility of the witnesses. Com. v. Hankerson, 118 A.3d 415, 420 (Pa.Super.2015) (citing Com. v. Forbes, 867 A.2d 1268, 1273-74 (Pa.Super.2005)). The jury’s verdict in this case was not so contrary to the-evidence as to shock one’s sense of justice.
Trial Court Opinion, filed 10/6/15, at 13-14.
Upon our review of Appellant’s “1925(b) Statement,” we find Appellant identified this issue with sufficient specificity such that we will decline to find this claim waived; notwithstanding, we further hold the trial court did not abuse its discretion in determining the jury’s verdict was not so contrary to the weight of the evidence so as to shock one’s sense of justice. Although Appellant begins his argument with an accurate recitation of the legal *981 standards that apply to such challenges, Appellant merely asks this Court to reweigh the evidence and find that which inculpated him was incredible. This we cannot do. Commonwealth v. Landis, 89 A.3d 694, 699 (Pa.Super.2014). Appellant’s discussion of the issue simply references, in brief, separate paragraphs devoted to each, various inconsistencies in the testimony and pretrial statements' of Session, Burton, Fundenberg, Pressley, Neugent and Lewis and generally states at the conclusion of each paragraph that it is “shocking” a jury would have relied upon such testimony. Appellant’s Brief at 29-31. It was within the province of the jury to make credibility determinations in this regard, and this Court will not reweigh such credibility determinations on appeal. “A jury decision to credit certain evidence and reject other testimony is appropriate; therefore, the trial court did not abuse its discretion in concluding that its sense of justice was not shocked by the verdict.” Commonwealth v. Sanders, 42 A.3d 325, 331 (Pa.Super.2012).
Finally, Appellant argues the evidence was insufficient to sustain his convictions because, “the circumstantial inferences drawn from the evidence were unwarranted and unreliable.” In the five sentences he devotes to his argument in support of this issue, Appellant generally avers the eyewitnesses were so unreliable that the essential element of Appellant’s identity as the shooter could not have been established. Appellant’s Brief at 32.
When examining a challenge to the sufficiency of the evidence, this Court employs a well-settled standard of review:
The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial [] in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant’s guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability, of fact may. be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in' applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence.
Commonwealth v. Talbert, 129 A.3d 536, 542-43 (Pa.Super.2015) (citation omitted).
In its Opinion filed pursuant to Pa.R.A.P.1925(a), the trial court found Appellant’s recitation of this issue in his “1925(b) Statement” was too broad to apprise the court of the precise challenges he wished to present and, therefore, its review and legal analysis had been impaired. Trial Court Opinion, filed 10/6/15, at 14 n. 2. Notwithstanding; the trial court proceeded to determine Appellant’s sufficiency claim lacked merit, because sufficient evidence had been presented to establish each element of first-degree murder. Id. *982 at 15-16.[7] We first consider whether Appellant has waived this issue.
Pennsylvania Rule of Appellate Procedure 1925(b) provides, inter alia, “Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph .(b)(4) are waived.” Pa. R.A.P.1925(b)(4)(vii).[8] In Commonwealth v. Garland, 63 A.3d 339 (Pa.Super.2013), this Court found the appellant had waived his sufficiency of the evidence claim where his 1925(b) statement simply averred the evidence was legally insufficient to support the convictions and in doing so reasoned:
In order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant’s Rule 1925(b) statement must state with specificity the element or elements upon' which the appellant alleges that the evidence was insufficient. “Such specificity is of particular importance in cases-.where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt.” Here, as is evident, [the alppell^nt ,.. failed to specify which elements he.was challenging in his Rule 1925(b) statement.... Thus, we find [his] sufficiency claim waived on this basis.
Id. at 344 (citations omitted).
In his concise statement, Appellant stated his sufficiency claim as follows:
The defendant’s convictions aré based upon insufficient evidence because the circumstantial inferences drawn from the evidence were unwarranted and unreliable.
Appellant’s 1925(b) Statement, at ¶ 4.
In -the instant case, Appellant was convicted of two counts of first-degree murder and two counts of VUFA each of which crime contained numerous elements. We find Appellant’s inarticulate concise statement failed clearly to state any element upon which he alleged the evidence was insufficient. Therefore, Appellant has waived this final issue. See Garland, supra.[9]
Judgment of sentence affirmed.

. 18 Pa.C.S.A. §§ 2502(a) .and 6106, respectively.

. Therein, the United States Supreme Court specifically held that sentences of mandatory life imprisonment'without parole for juvenile offenders constituted cruel and unusual punishment. U.S.C.A. Const. Amend. 8; 18 Pa. C.S.A. § 1102. Appellant was seventeen (17) years of age at the time of the offenses.

. Specifically, Pa.R.Crim.P,' 582(A) states:
Joinder — Trial of Separate Indictments of In- *976 formations
(A) Standards
(1) Offenses charged in separate indictments or informations may be tried together if:
(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or
(b) the offenses charged are based on the same act or transaction.
Pa.R.Crim.P. 582(A)(l)(a)-(b).

. Neugent was the only lay witness whose testimony pertained to both murders.

. While Appellant maintains in his appellate brief that he was depicted in the array with facial hair and dreadlocks, at the suppression hearing Appellant challenged only the fact that he had dreadlocks in the array shown to witnesses. N.T., 10/16/14, at 226.

. Importantly, the photographic array was not the sole means through which Appellant was identified as the shooter. Session, Appellant’s sister, revealed he was the perpetrator in the Featherstone murder, and Pressley, his girlfriend, indicated she was present when *980 Crowder was shot and killed and that Appellant told her he was the shooter.

. The Pennsylvania Crimes Code defines the offense of first-degree murder as a criminal homicide that is “committed by an intentional killing.” 18 Pa.C.S.A. § 2502(a). In order for an individual to be convicted of first-degree murder, "the Commonwealth must prove that a human being was unlawfully killed, that the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill.” Commonwealth v. Johnson, 630 Pa. 493, 107 A.3d 52, 66 (2014), cert. denied sub nom. Johnson v. Pennsylvania, — U.S. -, 136 S.Ct. 43, 193 L.Ed.2d 52 (2015) (citation omitted),. “It is well-settled that specific intent to kill can be established through circumstantial evidence such as the use of a .deadly, weapon on a vital part of the victim’s body.” Id. (citation omitted). The trial court did hot consider whether sufficient evidence had been presented to sustain Appellant’s VUFA convictions.

. Rule 1925(b)(4) provides:

Requirements; waiver.

* * *
(ii) The Statement shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge. The judge shall not require the citation to authorities; however, appellant may choose to include pertinent authorities in the Statement.
Pa.R.A.P.1925(b)(4)(ii).

. We note that even had Appellant properly preserved this issue in his “1925(b) Statement,” he devotes just one paragraph of argument to this claim in his appellate brief wherein he ignores the testimonial and ballistic evidence the Commonwealth presented and the fact that Appellant was convicted of *983 multiple crimes and claims the evidence was insufficient to establish "each element of the crime (emphasis added);” therefore, this claim is further waived for utter lack of development. See'Pa.R.A.P, 2119(a), (b) (requiring a properly developed argument for. each question presented including a discussion of and citation to authorities in appellate brief); Commonwealth v. Buterbaugh, 91 A.3d 1247, 1262 (Pa.Super.2014) (en banc) (failure to conform to the Rules of Appellate Procedure results in waiver of the underlying issue).