J-S24040-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBIN MCALLISTER | : | No. 350 EDA 2018 |

Appeal from the Order January 2, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005311-2017

BEFORE:   LAZARUS, J., McLAUGHLIN, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                         **FILED JULY 03, 2019**

The Commonwealth appeals from the January 2, 2018, order entered in the Court of Common Pleas of Philadelphia County granting Appellee Robin McAllister's pre-trial motion to suppress the out-of-court and in-court identifications of Appellee as the perpetrator of the crimes against Christopher Davis ("Mr. Davis").[1]  After a careful review, we reverse the trial court's order and remand for further proceedings consistent with this decision.

The relevant facts and procedural history are as follows:  Appellee was arrested and charged with various offenses in connection with the shooting of

_____

[1] Pursuant to Pa.R.A.P. 311(d), the Commonwealth has certified in its notice of appeal that the suppression order "terminates or substantially handicaps the prosecution."  Pa.R.A.P. 311(d).

_____

\*   Former Justice specially assigned to the Superior Court.

Mr. Davis.[2]  On November 27, 2017, Appellee filed a counseled pre-trial motion seeking to suppress Mr. Davis' out-of-court and in-court identifications of Appellee as the shooter.[3]  Specifically, Appellee averred the photo array shown to Mr. Davis was unduly suggestive, thereby rendering unreliable Mr. Davis' out-of-court identification.  Appellee further averred Mr. Davis had no independent basis for his identification of Appellee such that any proposed in-court identification should be suppressed.

On December 20, 2017, Appellee proceeded to a suppression hearing at which the Commonwealth presented the testimony of three witnesses: Police Officer Robert Zona, Detective Michael Repici, and Detective Michael Livewell. Appellee presented no witnesses.

Officer Zona, an eight year veteran of the police force, testified that, on May 5, 2017, at approximately 12:04 p.m., he was on duty and taking a burglary report in the 2500 block of Cleveland Street when an unknown male

_____

[2] Specifically, Appellee was charged with aggravated assault, 18 Pa.C.S.A. § 2702, possession of firearm, 18 Pa.C.S.A. § 6105, firearms not to be carried without a license, 18 Pa.C.S.A. § 6106, carrying firearms in public, 18 Pa.C.S.A. § 6108, possession of instrument of crime, 18 Pa.C.S.A. § 907, simple assault, 18 Pa.C.S.A. § 2701, and reckless endangerment, 18 Pa.C.S.A. § 2705.

[3] Appellee also sought the suppression of physical evidence seized by the police from 2450 North Gratz Street and sought to quash the bills of information based on insufficient evidence.  In separate orders, the trial court denied the motion to suppress the physical evidence, but granted, in part, Appellee's motion to quash.  Specifically, the trial court quashed the bill of information as to the charge of firearms not to be carried without a license. Neither of these orders are before this Court.

approached him. N.T., 12/20/17, at 22. The unknown male reported "that somebody was shot down the street." *Id.* In response, Officer Zona entered his patrol vehicle and drove halfway down the block where he observed Mr. Davis on the corner of Cleveland and Cumberland Streets. *Id.* at 22-23. Officer Zona exited his vehicle and discovered that Mr. Davis had been shot in the upper thigh. *Id.* at 23.

Mr. Davis indicated that he "got shot in front of a blue house on Gratz Street." *Id.* at 25. Officer Zona testified Mr. Davis did not report to him a specific address; however, he later came to learn that there is a blue house at 2400 Gratz Street. *Id.* at 26.

As to the description of the shooter, Mr. Davis reported "it was a black male, late 30s, early 40s, bald head, beard, no shirt, and black sweatpants." *Id.* at 24. Officer Zona provided the information over the police radio and transported Mr. Davis to the hospital via his police vehicle. *Id.* at 23-25, 31.

Officer Zona remained at the hospital, and approximately an hour later, Detective Repici and his partner, Detective Michael Rocks, arrived to question Mr. Davis. *Id.* at 32. Officer Zona left the room during the detectives' questioning of Mr. Davis. *Id.* The detectives then left the hospital and, approximately forty minutes later, at 1:49 p.m., Officer Zona received from Detective Repici a text message depicting "a house right next to a blue

house."[4]  **Id.** at 32-38.  Officer Zona asked Mr. Davis if 2450 North Gratz Street (the house sitting next to the blue house) was the house the male shooter had ran into after the shooting, and Mr. Davis replied affirmatively. **Id.** at 35.

Detective Repici, a fifteen year veteran of the police force, testified that he and his partner were assigned to investigate the shooting that took place on May 5, 2017, at 12:04 p.m., at the 2400 block of Gratz Street.  **Id.** at 71. He indicated that, immediately after receiving the assignment, he and his partner went to the hospital to interview the victim, Mr. Davis; however, they were unable to make contact with him at this time.  **Id.** at 71-72.  Accordingly, they went to the 2400 block of Gratz Street where, at 1:18 p.m., they discovered a "projectile from the top steps of 2450 North Gratz."  **Id.** at 73.

Detective Repici testified he and his partner went back to the hospital where they were able to make brief contact with Mr. Davis, who was still being treated by hospital personnel.  **Id.** at 77-79.  Detective Repici testified that Mr. Davis provided a "quick scenario" of what occurred, reported "he was shot from the 2400 Block of Gratz[,]" and "explained that it was a house with a black screen door with a porch, and it was next to an abandoned lot."  **Id.** at 79.  Armed with this information, Detective Repici returned to the scene, took a picture of 2450 Gratz Street, and texted it to Officer Zona, who replied that

---

[4] Officer Zona testified the text message depicted part of a blue house and another house sitting right next to it. **Id.** at 34-35.

Mr. Davis affirmatively identified the house as the one into which the shooter ran. *Id.* at 79-80.

Detective Repici prepared an affidavit of probable cause to secure a search warrant for the house. *Id.* at 84. In the affidavit, Detective Repici relevantly indicated the following:

> [Mr. Davis] stated that he was on the 2400 Block of North Gratz Street and was approached by a black male that he knows by the name of Rick. Rick gave him a bag of clothes.
>
> Shortly after this, an unknown black male approached [Mr. Davis] and confronted him about the bag of clothes. The male stated, "That's my bag of clothes" and produced a revolver and shot [Mr. Davis] one time in the leg.
>
> [Mr. Davis] further stated that he observed the male run in and out of the house on the 2400 Block of Gratz Street with a porch, black screen door and next to an abandoned lot.

*Id.* at 85. Detective Repici testified at the hearing that he received this information directly from Mr. Davis. *Id.* at 85-86.

Detective Repici confirmed the magistrate issued a search warrant at 5:00 p.m., and at 5:15 p.m., upon execution of the warrant at 2450 North Gratz Street, the police discovered "one pair of black sweatpants, [and] one blue, red, and white drawstring bag containing various clothes with price tags on them[.]" *Id.* at 88. Detective Repici confirmed that, based on the items seized from the house, the police were unable to identify the owner of the items, and no firearm was recovered at this time. *Id.* at 92-93.

After executing the search warrant, at 7:00 p.m., Detective Repici and his partner traveled back to the hospital to formally interview Mr. Davis. *Id.*

at 94. During the interview, Detective Repici received information from Detective Livewell indicating that the police had a suspect and were preparing a photo array to show Mr. Davis. *Id.* at 98. With regard to the photo array, Detective Repici relevantly testified as follows:

**Q.** When you say "prepare a photo array," what does that mean specifically?

**A.** When we say that, we're saying develop six—five photos along with the candidate or suspect in reference to this incident.

And at that time, we knew we needed somebody else to show the photo array.

**Q.** Why is that?

**A.** Because the way we show them, we show them the double-blind method.

**Q.** What does the double-blind method mean?

**A.** It means that we do not know who the suspect is, and the victim does not know who the suspect is.

**Q.** After speaking with this detective, was a photo array, eventually, compiled?

**A.** Yes.

**Q.** Did you see that photo array that night on May 5, 2017?

**A.** Not until after the interview.

**Q.** After the interview. Okay. During the interview, was—did someone show Mr. Davis that photo array?

**A.** Yes.

**Q.** Who showed the photo array?

**A.** Detective Keppol.

***

**Q.** Other than showing the house and the photo array for purposes of following the double-blind procedures, Detectives Keppol…wasn't [i]nvolved in your investigation with Detective Rocks?

**A.** No, they weren't involved in this investigation up until that point.

*** 

**Q.** Detective Repici, going back to the photo arrays, do you know, in your experience as a…detective, how images or photo arrays are compiled, for a lack of a better term?

**A.** Yes.

**Q.** Can you explain that to Her Honor?

**A.** Sure. Once we have the candidate or suspect, you can either physically enter the attributes of the characteristics of that male or female, or you could just click on the photo to similar images, and the database will go through a bunch of algorithms and processes and generate a bunch of people for you to pick from.

**Q.** And when you say "the database," what database are you referring to?

**A.** This one, mugshots.

**Q.** And do you know where the photographs of mugshots come from?

**A.** They come from the prison system.

**Q.** Is this the practice of the Philadelphia Police Department to photograph anybody that has been arrested for a crime in the city and county of Philadelphia?

**A.** Yes.

**Q.** And you have access and your brother detectives have access to that database?

**A.** Correct.

**Q.** In this particular case, is there any other database that's utilized in this photo array, if you know?

**A.** No.

**Q.** And you say "algorithms," do you know, generally, what the computer is doing when it generates similar images?

**A.** It's basically compiling a bunch of photos of males that have similar qualities to the candidate or suspect already selected.

**Q.** And those qualities, are they previously entered into the system once the photograph is entered into the system?

**A.** Usually, yes.

**Q.** When you say "qualities," what are you referring to specifically?

**A.** Skin color, height, weight, hair color, length, facial hair, scars, tattoos, stuff of that nature.

**Q.** And in this particular case, you had nothing to do with the actual arrangement or the selection of the six—five other photographs, as you were at the hospital the entire time?

**A.** Correct.

*Id.* at 98-100, 102-04.

Detective Repici confirmed that Mr. Davis chose photo number 3, which was Appellee's photo, from the array. *Id.* at 101. Detective Repici indicated that, prior to the instant incident, he did not know Appellee. *Id.* Based on Mr. Davis' identification of Appellee as the shooter, the police arrested him on May 17, 2017. *Id.* at 104.

On cross-examination, Detective Repici testified that the person identified as "Rick" in the affidavit of probable cause for the search warrant was determined to be a person who observed Mr. Davis after he had been shot. *Id.* at 115. Detective Repici indicated that, during the formal interview of Mr. Davis on May 5, 2017, at approximately 7:20 p.m., Mr. Davis described the shooter as "a black guy, bald, beard, six-something, no shirt. He was a little built, black sweatpants, a sunni beard." *Id.* at 121-22. Detective Repici testified that, in his experience, "sunni beards" are different lengths and colors. *Id.* at 123.

Detective Repici noted that, on May 11, 2017, at approximately 11:42 p.m., the police conducted a second formal interview with Mr. Davis, and Mr. Davis "further adopted" the previously chosen photo of Appellee as the

shooter. *Id.* at 141. Detective Repici testified that he interviewed a woman, S.B., who lived at 2450 North Gratz Street, and she informed him that she permitted Appellee to be at her house on May 5, 2017. *Id.* at 148-52.

Detective Livewell, a twenty-two year veteran of the police force, testified that he learned about the shooting during the evening of May 5, 2017, when he reported for his shift. *Id.* at 171. He indicated that, while Detectives Repici and Rocks interviewed Mr. Davis, he accessed the 75-48 Vehicle and Pedestrian Investigation System and determined that S.B. lived at 2450 North Gratz Street. *Id.* at 172. He further discovered that, in March of 2017, the police stopped a vehicle registered to S.B. in Philadelphia; S.B. was a passenger and Appellee was the operator. *Id.* Detective Livewell noted that the description of Appellee in connection with the vehicle stop listed him as being a male with a beard. *Id.* Accordingly, Detective Livewell accessed Appellee's mugshot and discovered he was an African-American bald man with a beard and birth date consistent with Mr. Davis' description of the shooter's age. *Id.* at 172-73.

Detective Livewell testified that, after he informed Detective Rocks of the existence of Appellee in connection with S.B., who lived at 2450 North Gratz (the house from which the projectile was recovered from the front steps), Detective Rocks asked him to create a photo array. *Id.* at 173. Detective Livewell described the following process:

> Because [Appellee] was the person that I searched...his face popped up in the system. You can put your cursor over that

picture, and it would be a right click. A subsequent box would pop up, and I clicked on similar images. So whatever algorithm, based on [Appellee's] description, whether bald, beard, black male. Based on the person---it would be the person entering the information into the computer at the time they take the picture.

So similar images would pop up in a page just on the same screen with a page of eight photographs that would be males similar to [Appellee].

As a result of that, I have to pick out five. I have—we want to prepare a double-blind photographic array, which would be six. I already have [Appellee]. And I went through the pages to see similar images of [Appellee].

Once I came up with six, I printed these pictures out on a color printer[.]

*Id.* at 173-74.

Detective Livewell testified the images from which he chose were all from the same database, the photographs were the same size, and the photographs had the same background. *Id.* at 175. The only difference was the person within the photograph. *Id.* Detective Livewell specifically testified that he did not alter the six photographs, which he compiled for the array, and he gave them to Detective Rocks. *Id.* at 177.

On cross-examination, Detective Livewell confirmed that he independently researched and discovered Appellee had been driving S.B.'s vehicle in March. *Id.* at 178. He confirmed that, when he saw that Appellee's physical description was consistent with the physical description of the shooter provided by Mr. Davis, he contacted Detective Rocks to inform him that he had a possible suspect. *Id.* At this point, he prepared the photo array. He noted that the computer chose a "bunch of photos" that would match

Appellee's description, and Detective Livewell then chose the final five to add to Appellee's photograph for the array. *Id.* at 181. He noted the computer program does not have "sunni" as a choice for a specific type of beard, and he indicated that "[t]here's all kinds of sunni style beards." *Id.* at 181-82.

With regard to Appellee's photograph, as compared to the five other people included in the array, the following relevant exchange occurred between Detective Livewell and defense counsel:

> **Q.** Now, would you agree with me that [Appellee's] picture is Photo Number 3 of that photo array?
>
> **A.** Yes, he is.
>
> **Q.** You'd agree that [Appellee's] beard is significantly longer than the beard of the person depicted in photos one, two, three—one, two, three—one, two, and four. I'm sorry.
>
> **A.** Okay.
>
> **Q.** You would agree with---
>
> **A.** I wouldn't necessarily say significantly, because a beard means, basically, facial hair. The information I had at the time was beard.
>
> **Q.** I understand, Detective. I just want to know that, if you would agree with me that [Appellee's] beard in those photos [is] significantly larger than photos one, two, and four?
>
> **A.** I would say it appears a little fuller and a little longer, but I wouldn't use the word "significant." I would say the guy, Number 6, has a significantly fuller beard.
>
> ***
>
> **Q.** You never had information about any tattoos, correct?
>
> **A.** The only information I was aware of was the paperwork that was on Detective Rocks' desk. It wasn't verbally, nobody asked me to do this. And I did it independently. I knew it was a black male with a beard and 30s and 40s. And that's all I knew.
>
> **Q.** So taking your attention to Photo Number 5, you'd agree with me that there's a tattoo on his neck on the left side?

- 11 -

**A.** I do see the tattoo.

**Q.** And I'll take your attention to Picture Number 6.

**A.** Black male with a beard.

**Q.** That's your interpretation?

**A.** That's my interpretation a little lighter skin black male with a beard, but it's a black male, little bald, with a beard.

*Id.* at 182-84.

Based on the aforementioned, by order entered on January 2, 2018, the trial court granted Appellee's motion to suppress the out-of-court and in-court identifications of Appellee as the perpetrator. Specifically, the trial court indicated the motion was granted "based on photo array, lack of evidence and [p]olice credibility." Trial Court Order, filed 1/2/18.

On January 8, 2018, the Commonwealth filed a motion for reconsideration of the order, and by order entered on January 22, 2018, the trial court denied the Commonwealth's motion for reconsideration. On January 29, 2018, the Commonwealth filed a notice of appeal from the trial court's suppression order. The trial court did not direct the Commonwealth to file a Pa.R.A.P. 1925(b) statement; however, the Commonwealth filed a statement on February 14, 2018. Thereafter, the trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

In its opinion, as to the reasons it granted Appellee's motion to suppress the out-of-court and in-court identifications, the trial court relevantly indicated the following:

[The Commonwealth's] sole complaint is that the [t]rial [c]ourt erred in granting the suppression of the out-of-court and in-court identifications, arguing that they were not suggestive and that there was an independent basis for identification. This argument is without merit.

First and foremost, the [t]rial [c]ourt found the testimony of [D]etectives Repici and Livewell to be evasive and incredible when discussing how the pictures were chosen for the photo array.

***

Here, there were several issues that led the [t]rial [c]ourt to find the photo array was unduly suggestive. The photo array contained six images. Within those six images shown to [Mr. Davis], the beards were an issue. The first, second, and fourth images depicted individuals with very slight beards. The fifth picture depicted a man with no mustache and more of a goatee than a beard. The final picture depicted someone with an extremely bushy beard. That left Appellee, in image number three, depicting a beard very different from the other five individuals. His beard very noticeably stood out amongst the six pictures, which added to the evidence of a suggestive line-up. Further, Appellee appeared larger within his picture than the other five individuals. His image was proportionally larger and took up more space of [*sic*] in [the] picture. With photo arrays it is necessary that everyone depicted is set up in the same or nearly the same way. Here, we had Appellee positioned in a much more pronounced way, which could cause him to stand out in the mind of the person viewing the photo array.

Additionally, there was no mention of the perpetrator having any tattoos, but two of the photos displayed individuals with noticeable tattoos on their faces and necks. One individual had a very visible tattoo of a teardrop near his eye. Another had a noticeably large tattoo on his neck. Moreover, there was a significant difference between the amount of hair each individual had. Specifically, images one, two, and six depicted individuals who were bald. Image four depicted an individual with noticeably thicker hair. Image five appeared to have braids. This left Appellee, in image three, being the only one depicted with some hair on the sides of his head, without being completely bald and not nearly as thick as some of the other men. There were minimal similarities between the men apart from skin tone, and even that was questionable at best. Photo arrays are required to have people who appear similar within the images. These men did not

appear similar and Appellee's picture stood out more so than the others, given his beard and how pronounced he was within his image specifically. Adding to the totality of the circumstances, we consider the credibility of the detectives. The [t]rial [c]ourt found that the detectives created a photo array specifically designed to single-out Appellee. Considering the totality of the circumstances, this creates a suggestive line-up with an irreparable likelihood of misidentification.

If an out-of-court identification is tainted as suggestive, an in-court identification may still stand if there is an origin sufficiently distinguishable to be purged of the primary taint. As explained by our…Supreme Court, there are five factors which must be considered when determining if there is an independent basis for the identification.

\*\*\*

Here the Commonwealth failed to prove by clear and convincing evidence any of the [five] factors. In order to establish this, the Commonwealth should have called [Mr. Davis] to the stand to testify as to the…five factors. Without that testimony, there is no evidence within the record to suggest that the witness had a good opportunity to view the perpetrator, [the victim's] degree of attention, the accuracy of the descriptions, or the [victim's] level of certainty. There is not enough evidence within the record to suggest that there exists an independent basis for the identification.

Trial Court Opinion, filed 7/20/18, at 3-6 (citations omitted).

On appeal, the Commonwealth first avers the trial court erred in suppressing Mr. Davis' out-of-court identification of Appellee as the shooter on the basis the photo array was impermissibly suggestive.[5] Specifically, the Commonwealth avers the photo array shown to Mr. Davis "depicted six men

---

[5] As the Commonwealth notes, there is no indication the trial court found the manner in which the police showed the photo array to Mr. Davis was unduly suggestive; but rather, the trial court concluded the photo array itself was unduly suggestive due to various perceived differences among the photos. Commonwealth's Brief at 15.

with substantially similar physical features and was thus not impermissibly suggestive." Commonwealth's Brief at 13.

In this vein, the Commonwealth notes Appellee's photo did not "stand out more than those of the others," all of the subjects "exhibit[ed] similar facial characteristics," "[e]ach photograph was primarily a head shot depicting the subjects' upper chest and shoulder area," "all of the men appeared to be wearing t-shirts," and the "backgrounds of each picture was…comparable in tone (light, neutral) and color scheme (gray or blue)." *Id.* at 15-16.

Moreover, the Commonwealth avers "the men depicted have substantially similar complexions, facial features, facial hair, and hairstyle." *Id.* at 16. The Commonwealth notes that all six men have facial hair with minimal variations as to length, and all six men have some baldness with variances as to the degree. *Id.* at 17. Additionally, the Commonwealth argues the prominence of Appellee's head was not larger relative to the size of the other men's heads, and the fact two of the men had tattoos does not render the array unduly suggestive. *Id.* at 18-19.

Initially, we set forth our standard of review:

> When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not

- 15 -

binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

***Commonwealth v. Fulmore***, 25 A.3d 340, 346 (Pa.Super. 2011) (citation

omitted).

> Whether an out of court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances. Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but suggestiveness alone does not warrant exclusion. Identification evidence will not be suppressed unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Photographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics.
>
> Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing.

***Commonwealth v. Stiles***, 143 A.3d 968, 978 (Pa.Super. 2016) (citations

omitted).

We have reviewed the photo array at issue in this case to determine if

it was unduly suggestive with respect to the photographs.[6] As indicated *supra*,

photographs are not unduly suggestive if the suspect's picture does not stand

out more than those of the others and the subjects all exhibit similar facial

characteristics. ***See id.***

---

[6] The color photo array is included in the certified record.

Initially, the background of each photo is similar, each photo is a headshot, and each photo depicts a man wearing a t-shirt. Further, Mr. Davis reported the shooter "was a black male, late 30s, early 40s, bald head, [and] beard[.]" N.T., 12/20/17, at 24. All of the men depicted appear to be of a similar age, and they have similar complexions, facial hair, and hairlines. We specifically disagree with the trial court's factual finding that Appellee had a beard that was "very different from the other five individuals" or that he was the only person "with some hair on the sides of his head, without being completely bald[.]" Trial Court Opinion, filed 7/20/18, at 3-5. Simply put, while there were variations in the length of the beard and the degree of baldness among the subjects, the variations did not somehow make Appellee's picture stand out more than the others. *See Stiles*, *supra*.

Further, unlike the trial court, we do not conclude that the variation in the length of the beard, the degree of baldness, or the fact two men (neither of which were Appellee) had tattoos requires a legal determination that the people depicted did not all "exhibit similar facial characteristics." *Id.* at 978 (citation omitted).

In *Commonwealth v. Fisher*, 564 Pa. 505, 769 A.2d 1116 (2001), the appellant argued that the photo array was unduly suggestive because "both witnesses described the suspect as a light-skinned African–American male with freckles and a goatee, while only six of the eight pictures in the line-up showed men with goatees, and only one, the picture of [the][a]ppellant,

- 17 -

showed a man with freckles." ***Id.*** at 1126. Despite the fact that all of the men in the photographs did not have goatees or freckles, th[e] [Supreme] Court held that the photographs were substantially similar[.]" ***Id.*** at 1127.

In the case *sub judice*, while there were discrepancies among the men, we cannot accept the trial court's assessment that Appellee's photo somehow stood out from the others so as to increase the likelihood that his photo would be chosen. ***See Commonwealth v. Kearney***, 92 A.3d 51 (Pa.Super. 2014) (holding incidental variations in appearance does not prove undue suggestiveness); ***Commonwealth v. Crork***, 966 A.2d 585 (Pa.Super. 2009) (rejecting the appellant's claim that the photo array was unduly suggestive where the array contained men of similar appearance but only one other man with light colored eyes; the appellant's photo did not stand out from the others).

Further, regarding the trial court's factual finding that Appellee's image "appeared larger within his picture than the other five individuals[,]" initially, upon reviewing the photo array, we find no record support for this finding. In any event, whatever discrepancy perceived by the trial court in this regard did not make Appellee's photo stand out more than the others so as to suggest that he was the suspect. ***See Commonwealth v. Patterson***, 940 A.2d 493 (Pa.Super. 2007) (holding array was not suggestive were the appellant's neck and shoulders were visible to the greatest extent, but all of the photographs

depicted the subject's neck and at least three of the other photographs displayed the subject's shoulders).

Here, in considering the totality of the circumstances, we conclude that Mr. Davis' out-of-court identification was not based upon a photo array so infected by suggestiveness as to give rise to a substantial likelihood of irreparable misidentification. **See Stiles**, **supra**. "As the photo array is not remarkable in any way, we find the trial court's determination to be in error."[7] **Fulmore**, 25 A.3d at 348.

Finding nothing in the record that indicates any of the pre-trial identification proceedings were tainted, we need not reach the second question of whether the in-court identification is inadmissible based on the suggestiveness of the out-of-court identification and lacking an independent basis. **See id.** at 349.

_____

[7] We note the trial court "found the testimony of [D]etectives Repici and Livewell to be evasive and incredible when discussing *how* the pictures were chosen for the photo array." Trial Court Opinion, filed 7/20/18, at 3 (emphasis added). While the manner in which the police chose the photos may relate to the credibility of Mr. Davis' identification of Appellee, it does not require a conclusion that the resulting photo array was unduly suggestive. **See Fulmore**, **supra**. Further, we specifically note that we have held there is no *per se* rule against the use of "mugshots," as occurred in the case *sub judice*, for identification purposes. **Commonwealth v. Roane**, 142 A.3d 79 (Pa.Super. 2016). Moreover, based upon our review of the photo array, we find no record support for the trial court's holding that "the detectives created a photo array specifically designed to single-out Appellee." Trial Court Opinion, filed 7/20/18, at 5.

Order suppressing out-of-court and in-court identifications is REVERSED; case REMANDED; jurisdiction is RELINQUISHED.

Judge McLaughlin has joined the memorandum.

Judge Lazarus files a concurring memorandum.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/3/19