J-S56006-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JASON ANDERSON | : | |
| | : | |
| Appellant | : | No. 234 EDA 2019 |

Appeal from the Judgment of Sentence Entered December 12, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001233-2014

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED:  MARCH 19, 2021**

Appellant, Jason Anderson, appeals from the judgment of sentence of an aggregate term of 6-12 years' imprisonment, imposed after he was convicted, following a non-jury trial, of firearms not to be carried without a license, 18 Pa.C.S. § 6106(a)(1), carrying firearms in public in Philadelphia, 18 Pa.C.S. § 6108, and impersonating a public servant, 18 Pa.C.S. § 4912.[1] We affirm.

The trial court summarized the relevant facts of this case as follows:

Officer [Michael] Carey testified that on November 3..., 2013[,] around 2:53 A.M., he received a radio call which "reported a gun shot, and an off[-]duty officer was involved."   Once the officer

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We note that Subsection 6106(a)(1) and Section 6108 are provisions of the Pennsylvania Uniform Firearms Act of 1995 ("PUFA"), 18 Pa.C.S. §§ 6101-6128.  Herein, we sometimes refer to Appellant's convictions under Subsection 6106(a)(1) and Section 6108 collectively as his "PUFA convictions."

[arrived] on Dewey Street, he approached [Appellant] and asked him what happened. Officer Carey observed [Appellant dressed] in all black, with a badge, an outer vest, boots, and what looked like a police uniform. Officer Carey stated, "[A]nd, to me, I thought he was an officer." Officer Carey then stated that [Appellant] told him that[:]

[A] Dodge black Charger was blocking the highway and words were exchanged with [Appellant] and the driver[,] and the guy with the Charger told [Appellant] that 'oh, you one of those flashlight cops.' And the guy with the [C]harger pull[ed] his gun out, [Appellant] pull[ed] his gun out, and [Appellant] had a vest on — the guy observed [Appellant] with the vest on and he aimed his gun — the guy with the [C]harger aimed his gun to [Appellant's] forehead. [Appellant] grab[bed] the [other guy's] gun and the gun discharged[,] and [Appellant's] gun discharged, striking the driver with the Dodge — striking him on the forehead and[,] while [Appellant] was holding [the other guy's] gun, [Appellant] got struck with his pinky finger.[2]

Further[,] Officer Carey testified that he even prayed with [Appellant] after coming to the scene. After telling [the] Commonwealth what happened during the exchange between him and [Appellant], [d]efense counsel asked Officer Carey, "So you saw [Appellant] in this jacket, and you saw him, and you thought he was a police officer?" Officer Carey responded, "[Y]es." Defense counsel then asked, "[A]nd you thought he was [an] on-scene police officer and asked what happened?" Officer Carey responded, "[C]orrect." Officer Carey then testified that when he saw [Appellant], [Appellant] was wearing an off[-]duty badge with a chain on it. Defense [c]ounsel asked him to further explain what is an "off[-]duty badge"; Officer Carey responded with, "[W]hen I say 'off-duty badge,' that's a particular — that's what we carry. You know, I mean, if I'm off duty, I'll carry an off[-]duty badge with me." Defense [c]ounsel then ask[ed] if the badge was displayed on [Appellant's] vest, to which Officer [Carey] responded, "[Y]es."

_____

2 Tragically, the man with the Dodge Charger —Mark Ellis — died at the scene, **see** N.T. Trial, 10/9/18, at 20, and therefore, the trial court later refers to him in its opinion as 'the decedent.'

Officer Robert Stott, who has been working as a Philadelphia police officer in the firearms identification unit for 20 years, then gave his testimony to the court that both guns recovered from Dewey Street were test fired and operable. [The] Commonwealth then asked Officer Stott, "[T]he FCC[,[3]] that was still inside the [decedent's 9mm] gun, is this correct?"[4] Officer Stott answered in the affirmative. [The] Commonwealth then asked why did the bullets not eject, [and] Officer Stott answered,

> Well, the cartridge failed to eject from the mechanism of the firearm. Well, there's several reasons why that could happen, it could be a malfunction of the cartridge, or the gun was impeded from functioning properly. That can happen if something blocks the movement of the slide, whether it[s] the shooter not properly holding it or someone else grabs onto the slide of the gun[,] that could impede the function of the gun.

[The] Commonwealth then asked were there any 9mm bullet specimen or fragment recovered; the officer answered that "none were submitted." [The] Commonwealth then asked how many times was the .40 caliber fired.[5] The officer stated that he had received "nine fired cartridge casings and [five] bullet specimen."

After hearing testimony from Officer Stott, the court heard testimony from Syreeta Manire, the pregnant girlfriend of the decedent, and she testified that she was waiting for the decedent outside because he went to get food for her and the family. After receiving the food, she went in the house to put the food down as [the] decedent was parking. While going to put the food down, Ms. Manire heard the decedent and [Appellant] arguing[,] and came back down the steps. Ms. Manire testified that she could see them because the incident happened right under a street light. While the [d]ecedent and [Appellant] were still arguing, Ms. Manire came to the car and started "pleading and begging" with both of them to calm down. She testified that [Appellant] asked

_____

[3] "FCC" stands for fired cartridge casing. N.T. at 45.

[4] A 9mm pistol was recovered inside of the Dodge Charger, on the driver's side, where the decedent was also found. N.T. at 20, 39-40.

[5] Officer Carey testified that he recovered a .40 black caliber handgun from Appellant. N.T. at 19-20.

- 3 -

[the d]ecedent why did he pull up to his car like that[,] and [the d]ecedent said because [Appellant] was double-parked for a long time. Ms. Manire testified that[,] as the arguing continued, [Appellant] had his hand on his gun and drew it[,] causing [the d]ecedent to also draw his gun. The decedent then said that he was licensed to carry, [and Appellant] said, "[M]e too." As they continued arguing, Ms. Manire pleaded with both of them to calm down. [The d]ecedent elbow[ed] Ms. Manire to push her back, [and Appellant] grab[bed] [the d]ecedent's gun, pull[ed] it down[,] and then sho[t the d]ecedent. Ms. Manire stated that[,] when she heard the gun shots, she ran towards the house and kept running because she continued to hear multiple gun shots. [The] Commonwealth asked, "[H]ow was [Appellant] dressed?" Ms. Manire testified that "he had on a bullet[-]proof vest. He had a, like, a badge that came down, a gun on his hip, and jeans on." She also testified that after the shooting, "everyone kept hollering 'he[']s a cop. He[']s a cop.'" Ms. Manire stated, "[W]hen you first look at him[, y]ou would think he was a cop."

Detective John Keen testified that, when he first came in contact with [Appellant], "he had a bullet[-]proof vest on — or a vest on with a badge on it. He had a regular badge — silver badge, mace, a holster." When Detective Keen asked [Appellant] whether he had a license to carry a gun, [Appellant] answered, "No. I … have my ACT 235[6] certification, and I am presently going through a

_____

[6] "Act 235" refers to the Lethal Weapons Training Act, Act. No. 1974-235, P.L. 705 (Oct. 10, 1974), 22 P.S. §§ 41 to 50.1. In short, Act 235 "requires privately employed agents who carry lethal weapons to attend an educational and training program established by the State Police Commissioner and provides for them to receive 'certification' when the program is satisfactorily completed." *See Commonwealth v. Anderson*, 169 A.3d 1092, 1099 (Pa. Super. 2017) (*en banc*) (citation omitted). This Court has held that "Act 235 is not a 'substitution' for a license to carry a firearm and that Act 235's provisions do not supersede the licensing requirements in the PUFA." *Id.* at 1103.

We also take note that *Anderson* involved an appeal by the Commonwealth from an order quashing the PUFA charges against Appellant, after the trial court determined that Appellant could not be charged with violating the PUFA due to special provisions under Act 235. *Id.* at 1093-94.

process to get my license to carry." Detective Keen was asked by [d]efense counsel whether [Appellant] produced his ACT 235 certification. Detective Keen responded … that [Appellant] gave him an ID that said special agent. [The] Commonwealth then asked whether on [Appellant's] 75229[7] it lists his occupation. Detective Keen answered [that] "it says security guard." [The] Commonwealth then asked Detective [Keen] who is the employer. Detective [Keen] said "self-employed." After the testimony of Detective Keen, [the] Commonwealth moved [Exhibit] C-29 into evidence and stated,

> this is a self-authenticating document from the commissioner of Pennsylvania State Police, Colonel Frank Newtown, that [Appellant], with a date of birth of 10/28/88, on the date in question, 11/03/2013, did not have a valid license to carry a firearm issued under the provisions of Section 6109 of the crimes code, and he did not have a valid sportsman firearm permit issued under the provisions of Section 6106[(c)] of the crimes code.

After hearing testimony from Detective Keen, the court heard testimony from Cylena Stewart, [Appellant's] fiancé, and she testified that she and [Appellant] have known each other for 6 years.[8] Ms. Stewart also testified that her car was the car that was used [o]n the night in question. [The] Commonwealth asked whether [Appellant] lived with her. Ms. Stewart stated, "[N]o." [The] Commonwealth asked whether he lived with someone else. Ms. Stewart said he had a roommate. [The] Commonwealth asked Ms. Stewart whether anything happened with his female roommate. Ms. Stewart stated, "[A] false accusation happened." [The] Commonwealth then asked, "[A]nd he's not allowed to live

_____

The *en banc* panel of this Court reversed the trial court's order and remanded for further proceedings, explaining that "[a]n Act 235 certificate … does not act as the 'license' required by Sections 6106 and 6108 of the PUFA and cannot serve as a substitute for that license." ***Id.*** at 1100.

[7] A '75229' refers to the biographical information detectives obtain from the people they question. N.T. at 106.

[8] Appellant also called other character witnesses, which the trial court does not mention in its summary.

where any other women live, isn't that right? Wasn't that a conviction?" Ms. Stewart[] stated "to that situation, yes."

\*\*\*

[Defense counsel then called Dominique Brown.] Ms. Brown testified that she was at a party and contacted [Appellant] to come take her home. Defense [c]ounsel asked Ms. Brown what [Appellant had] … on. Ms. Brown stated, "[H]e had his work uniform, a bullet[-]proof vest, a badge." Ms. Brown then testified [about the incident in question, stating],

> Yeah. [Appellant's] just asking [the decedent], like, 'Is everything okay?' Like, 'You cool?' [Appellant] said, 'You running up on the back of the car.' Like, 'Is everything all right?' And [the decedent] said something like -- he was saying something like, 'Oh, you' -- something about [Appellant's] pretending to be a cop, or, 'You ain't a cop, that's a costume.' And [Appellant] was like, 'No.' [Appellant] said, 'This is my' -– he said, 'This is my uniform.' Like, 'I'm an agent.' Like, 'This is my uniform.' [Appellant] said, 'My name' – 'This is my nametag right here, and this is my badge.' And [the decedent] was like, 'No. No. You ain't a cop.' He said, 'Oh.' He said, 'You think you a cop 'cause you got a gun.' He was like, 'Cause I got a gun, too.' So then [Appellant] said, 'Well, what is that supposed to mean?' So then he said, 'What's that's supposed to mean?' [Appellant] said, 'Show me your hands. I can't see your hands.' So -- So the guy, he said it again. [Appellant] said, "I can't see your hands. Show me your hands." And when [the decedent] show[ed] him his hands, he pulled the gun out and shot. [Appellant] slapped it with his left hand and grabbed the gun. They tussled while [Appellant] tried to reach to get his firearm from his right hip, I guess, under his shirt.

[The] Commonwealth asked whether she heard [Appellant] tell [the] decedent that he was a cop. Ms. Brown stated the [decedent] kept saying, "'[Y]ou ain't no cop. You ain't no cop.' That's it. And then [Appellant was] just, like, 'What you mean? I am.' Like, 'I got my nametag. This is mine. This is my nametag. This is my badge.' And his name is on the back. That was it.[]" [The] Commonwealth then asked, "Okay. So [Appellant] told the guy that he was a cop?" Ms. Brown stated, "Yes." [The] Commonwealth then asked, "[Y]ou thought he was a cop[?]" Ms.

Brown stated, "I never asked. This is what I'm telling you: I never asked him what type of police officer he was. I just assumed that he was, and we never had a discussion about what exactly he did. I just knew I saw a badge, I saw a bullet-proof vest, and I saw his holster, that was it."

After hearing testimony from Dominique Brown, the court heard testimony from [Appellant]. Defense counsel asked what is [Appellant's] understanding of the Act 235 certification, to which [Appellant] responded, "My Act 235 certification card certifies me to carry my -- a lethal weapon from -- to, from, and while I'm on duty."[9] Defense counsel asked whether [Appellant] was incorporated at the time, [Appellant] responded, "No, I was -- I did everything independently on my own. I didn't do -- through a middle man or through a company, no." [Appellant] was then asked whether he had a gun on him that night in the holster. He responded in the affirmative. Defense [c]ounsel asked, if he was going to go pick up his friend in West Philly, why did he not go back home to drop off his gun. [Appellant] stated,

> Because I actually remember having a very long night, and, literally, it's like -- it's like the same thing -- it's the flip side of the Act 235, even if, you know, even if you're going to work. I'm not a robot. I'm a human being just like anybody else. It allows me to carry my firearm to, from, and while I'm on duty…. Am I supposed to not go, and go all the way home, take everything off, and then come back out the house to go all the way to West Philly, to come all the way back to North Philly, then drop [Ms. Brown] off, and then come all the way back to my home?

_____

9 For more context, Appellant testified that he does security for "different people. Studios, Made in America, Chuckle's Bar, strip clubs, *et cetera*." N.T. at 164. On the night in question, Appellant said he was "doing a job at Chuckle['s] Bar[,]" **see id.**, and stated that he is "normally the first person that you see when you come in, because I'm the one who collects -- if they had events or parties there, I'm the one who collects the money, and I have to -- when it gets to a certain amount, I have to take the money downstairs to the guy to put in, I guess, the safes or whatever." **Id.** at 169. Appellant also explained that Chuckle's Bar had hired him because "they kept getting robbed for their lottery machine. Guys were walking in, taking the liquor from behind the shelf, selling drugs, whatever in there, stealing money out of the cash register. It was a whole big thing." **Id.** at 167.

[The] Commonwealth then asked [Appellant] whether he had a permit to carry, [and Appellant] responded in the negative. [The] Commonwealth then asked, "[Y]ou never had a permit to carry?" [Appellant] responded,

No, I didn't. Because my job, whatever, didn't … require a permit to carry. A permit to carry is if [Ms. Brown] would have called me, and I was in my house, and I would have picked up my gun, put it on my hip, and I walked out the house. That wasn't the case. My Act 235 allows me to carry my firearm when I'm coming out of work to go to -- home or in the process of going home. So a permit to carry would have been necessary if I would have picked up my gun if she called me at home, or wasn't coming from home[,] to put my gun on my waist to go get her. That wasn't the case. My Act 235 covers me because I was coming from work.

[The] Commonwealth then state[d], "[O]kay. But bottom line is, sir: you did not have a license to carry that gun that night?" [Appellant] stated, "I had my Act 235, yes." [The] Commonwealth then stated, "[T]hat's not a license?" [Appellant] stated, "[T]hat's a certification that allows you to carry a firearm."

After [the] Commonwealth finished questioning [Appellant], the court asked [Appellant] what was his occupation, and [Appellant] stated that he was a security guard. [Appellant] also stated, "But they call -- certified agents, you have to go get certified either at an academy, or something like that, and literally you basically get basic training on handguns, cuffing, and different things." The court then asked whether he had his own business. [Appellant] answer[ed], "I didn't, *per se*, have my own business, but I would go around and basically … go around and get[] the work for everybody. I was like the mouthpiece." The court then asked if he had a business license. [Appellant] stated, "No, I didn't have a business license." The court then stated, "Okay. But you had no license, you were not incorporated as a business, and did you hold yourself out on taxes as a business?" [Appellant] stated, "Did I hold myself out to pay taxes? I don't know if the owner wrote us off or not. He said … that that's what they would do, but I'm not sure." The court then questioned how [Appellant] got paid, and he responded[] in cash. The court then asked, "You got paid in cash? Okay. And on your income tax, did you report yourself as a business?" [Appellant] responded, "I didn't file -- the last time -- I didn't get a chance to file income taxes in 2013 because of everything that happened." The court asked how long was he

involved in the security business, [and Appellant] responded, "I got [in] it in 2010, but I was still working at Girard Medical Center doing regular security, and when I actually started doing that independent work … that was like 2012[,] going into 2013." The [c]ourt then asked [Appellant] whether he held himself out and paid taxes in the year of 2012 with the IRS, [Appellant] stated, "No. I didn't -- no. I did my regular … taxes from Girard Medical Center."

The court then asked how did he purchase the gun; [Appellant] stated[] that he got it from a store named Mike and Kates[,] and that "they ran my name, called the State Police, they verified me, and they gave me the gun." The court then asked did he get a permit to carry from the State Police. [Appellant] stated, "Did I get a permit to carry from the State Police? The Act 235—[.]" The court asked other than the Act 235, did [Appellant] get a license or permit to carry a weapon; [Appellant] stated, "No." [Appellant] stated that the private police gear was given to him by Mike and Kates. The court then asked, "[Y]ou don't work for anybody but yourself?" [Appellant] stated, "[R]ight." The court then asked what … the badge he received meant. [Appellant] stated, "That's something through the State Police, whatever, that they have." The court then asked, "Did you file any paperwork that you can show us today, or did you give to your lawyer, any paperwork from the State Police that gave you a badge that's designated private police 1003?"[10] [Appellant] stated, "No."

Trial Court Opinion ("TCO"), 12/18/19, at 1-10 (internal citations and brackets omitted).

At the conclusion of the non-jury trial, the trial court found Appellant guilty of firearms not to be carried without a license, carrying firearms in public

_____

[10] Officer Carey testified that, when he first came in contact with Appellant on the night in question, Appellant was wearing a badge that read "PVT Police 1003." N.T. at 17, 26-27.

in Philadelphia, and impersonating a public servant.[11]  It subsequently

sentenced Appellant to an aggregate term of 6-12 years' imprisonment.[12]

Appellant then filed a timely notice of appeal, and timely complied with the

trial court's instruction to file a Pa.R.A.P. 1925(b) concise statement of errors

complained of on appeal.  The court subsequently filed a Rule 1925(a) opinion.

Appellant now presents the following issues for our review, which we

have re-ordered for ease of disposition:

> [1.] The [PUFA] carries an exception for agents of firms who require firearms in the discharge of their duties.  [Appellant] was employed as a security guard and had been working on the night of his arrest.  Is [Appellant] an agent for which the exception applies?

> [2.] A conviction for impersonating a public servant requires proof at trial that the defendant intended to be mistaken for a public servant.  The trial court's opinion relied on testimony provided at sentencing, not trial.   Is evidence provided at sentencing justification for a decision at trial?

> [3.] A defendant is entitled to sentencing by a judge whose impartiality cannot reasonably be questioned.  [The trial court] stated that [it] thought [Appellant] was guilty of severe crimes for which he had not been charged, and expressed anger that the Commonwealth had not charged them.  Should the sentence be vacated and reassigned to a judge whose impartiality cannot be questioned?

Appellant's Brief at 4-5.

---

[11] The trial court found the detective's and police officers' testimony credible and accepted it in full, but did not find the testimony of Appellant and his fiancé, Cylena Stewart, credible and did not accept it.  TCO at 11.  The trial court stated that it also did not find Dominque Brown's testimony credible and did not accept it in full.  *Id.*

[12] Appellant did not file a post-sentence motion.

- 10 -

**Issue 1**

In Appellant's first issue, he claims that his actions fell within an exception to the PUFA because he was employed as a security guard and had been working on the night of his arrest. Under the PUFA, Appellant was convicted of violating Subsection 6106(a)(1) and Section 6108.[13] However, Appellant explains that Subsection 6106(b)(6) provides an exception to the licensing requirements of Subsection 6106(a)(1) and Section 6108 for "[a]gents, messengers and other employees of common carriers, banks, or business firms, whose duties require them to protect moneys, valuables and other property in the discharge of such duties." *Id.* at 15 (quoting 18 Pa.C.S. § 6106(b)(6)); *see also* 18 Pa.C.S. § 6106(b) (stating that the provisions of Subsection 6106(a) do not apply to the exceptions listed in Subsection 6106(b)); 18 Pa.C.S. § 6108(2). Appellant says that the Subsection 6106(b)(6) exemption applies to him because he was a security guard at the time, and, therefore, his PUFA convictions under Subsection 6106(a)(1) and Section 6108 must not stand. *See id.* at 18.

_____

[13] Subsection 6106(a)(1) provides that "any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree." 18 Pa.C.S. § 6106(a)(1). Section 6108 sets forth that "[n]o person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless: (1) such person is licensed to carry a firearm; or (2) such a person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license)." 18 Pa.C.S. § 6108.

As we review this claim, we remain mindful that "the exceptions in [S]ubsection [6106](b) are not elements of the offense which the Commonwealth must prove beyond a reasonable doubt if a conviction is to be sustained, but are rather affirmative defenses which must be proven by the accused." **Commonwealth v. Walton**, 529 A.2d 15, 17 (Pa. Super. 1987) (citations and footnote omitted). **See also Commonwealth v. Lopez**, 565 A.2d 437, 440 (Pa. 1989) ("Subsection (b) specifically enumerates certain justifications for carrying a firearm outside one's home or fixed place of business. [T]hese exceptions are affirmative defenses, which must be placed in issue by the defendant, and which need not be negated by the prosecutor in its case-in-chief.") (citations omitted).

Here, the trial court determined that the Subsection 6106(b)(6) exemption did not apply to Appellant because his employment did not qualify him to use that exception. The trial court opined that Appellant "was not a legitimate agent under [that section] because he was self-employed, was not incorporated, did not pay taxes, and could not provide paperwork from the State Police that gave him that badge, nor clearly explained what his badge means…." TCO at 22. Appellant contests this rationale, complaining that other cases that have examined the Subsection 6106(b)(6) exemption did not "concern[] themselves with the tax status or independent contractor status of the supposed agent." Appellant's Brief at 17. He also protests that the trial court "did not provide any authority to support its position that an 'agent' must be sanctioned by the government and must have a standard employee-

employer relationship, complete with a W-2 tax form, to be a proper agent." *Id.* Appellant maintains that he "provided sufficient evidence that he was employed in an agency relationship. He testified as to his work, and had a fellow security guard testify that he knew [Appellant] from working as security in bars." *Id.* at 18 (citing N.T. at 120-28 (testimony from character witness, Malik Ligons, that he knows Appellant from "the neighborhood" and "from [Appellant's] working at different bars that I attend, because I also go out to different bars a lot")).

We need not reach the issue of whether Appellant's employment satisfies the requirements of Subsection 6106(b)(6) because there are clearer reasons for why that exception is inapplicable in these circumstances.[14] As the Commonwealth discerns, regardless of the legitimacy of Appellant's job, Appellant could not use the Subsection 6106(b)(6) exemption because "he was not acting in the performance of his duties as a security guard during the incident leading up to the death of [the decedent]." Commonwealth's Brief at 27. Indeed, this Court has described the Section 6106(b)(6) exemption as follows:

> This exception permits someone employed by certain classes of entities to carry a concealed firearm, but only if the concealed carrying of the firearm occurs "in the discharge of [their] duties."
>
> The limitation to the exception—that the person may carry a concealed firearm only in the discharge of their duties "to protect

---

[14] We therefore express no opinion on the trial court's analysis pertaining to whether Appellant's employment qualifies under Subsection 6106(b)(6).

moneys, valuables and other properties"—is clear not only from the plain language of the exception, but also when read in context of the remaining exceptions [under Section 6106(b)]. Subsection (b)(1) … permits those qualified for the exception to carry a concealed firearm with no limitation.[15]  Other exceptions, however, limit the permitted concealed carrying to specified times.  For example, subsection (b)(2) permits "[m]embers of the army, navy, marine corps, air force or coast guard of the United States or of the National Guard or organized reserves **when on duty**"; and subsection 6106(b)(7) permits those engaged "in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person, having in his possession, using or carrying a firearm **in the usual or ordinary course of such business**."  18 Pa.C.S. § 6106(b)(2), (7) (emphasis added).[7]  Therefore, we conclude that subsection 6106(b)(6) permits an individual to carry a concealed firearm only: (1) if his or her employment qualifies under the subsection; and (2) he or she carries a concealed firearm **while** discharging his or her duty to protect "moneys, valuables and other property."

[7] Additional exceptions with time limitations include:

> **(b) Exceptions.**—The provisions of subsection (a) shall not apply to:
>
> …
>
> (4) Any persons engaged in target shooting with a firearm, if such persons are at or are going to or from their places of assembly or target practice and if, while going to or from their places of assembly or target practice, the firearm is not loaded.
>
> …
>
> (9) Persons licensed to hunt, take furbearers or fish in this Commonwealth, if such persons are actually hunting, taking furbearers or fishing as permitted by such license, or are going to the places where they

_____

[15] Subsection 6106(b)(1) provides an exemption for "[c]onstables, sheriffs, prison or jail wardens, or their deputies, policemen of this Commonwealth or its political subdivisions, or other law-enforcement officers."  18 Pa.C.S. § 6106(b)(1).

> > desire to hunt, take furbearers or fish or returning from such places.
>
> 18 Pa.C.S. § 6106(b)(4), (9).

*Commonwealth v. Scott*, 176 A.3d 283, 288-89 (Pa. Super. 2017) (emphasis in original).

Here, Appellant did not carry a concealed firearm *while* discharging his duty to protect "moneys, valuables and other property." As the Commonwealth points out, "[Appellant] could not characterize his efforts to pick up a woman at a party after his work shift had ended and engage in a heated traffic dispute [as] acts consistent with, or in the furtherance of, the discharge of a duty to protect money, valuables, and other property." Commonwealth's Brief at 28; *see also id.* at 27-28 ("To the extent that Section 6106(b) would have hypothetically exempted [Appellant] from gun licensing requirements for purposes of acting as a security guard and perhaps for transporting his gun to and from his home and his assigned security post at a bar, it would not have provided him an exemption for driving from the bar to pick up a woman at a different section of Philadelphia from his home and then to have concealed carried his gun in some traffic dispute."). We agree. We also reiterate that it is Appellant's burden to prove that the

- 15 -

Subsection 6106(b)(6) exception applies, *see Walton*, 529 A.2d at 17, and he has not met that burden here.[16] Accordingly, no relief is due on this basis.[17]

**Issue 2**

In Appellant's second issue, he argues that the trial court "erred when it found [Appellant] guilty of impersonating a public servant, where [Appellant] did not represent himself as a public servant, the decedent did not believe he was a public servant, and the court relied on statements made at sentencing to justify the conviction." Appellant's Brief at 18 (emphasis omitted). The relevant statute provides that "[a] person commits a misdemeanor of the second degree if he falsely pretends to hold a position in the public service with intent to induce another to submit to such pretended official authority or otherwise to act in reliance upon that pretense to his prejudice." 18 Pa.C.S. § 4912. Appellant claims that he "made no intent to induce anyone to submit to him, nor is there any evidence that he pretended to be a police officer." *Id.* at 18.

Regarding this issue, the Commonwealth observes that Appellant "does not clearly identify whether he is presently challenging the weight or

_____

[16] Though Appellant filed a reply brief, he did not respond therein to the Commonwealth's argument that he did not carry a concealed firearm while discharging his duty to protect "moneys, valuables and other property."

[17] "We may, of course, affirm the decision of the trial court if the result is correct on any ground without regard to the grounds which the trial court itself relied upon." *Commonwealth v. Shaw*, 431 A.2d 897, 899 n.1 (Pa. 1981) (citation omitted).

sufficiency of the evidence, but, in either case, he could not state an entitlement to relief because his claim would be waived and meritless." Commonwealth's Brief at 29.[18]  Again, we agree.  The Commonwealth aptly explains:

> To the extent that this claim constitutes a challenge to the weight of the evidence, [Appellant] waived it by not preserving it before the trial court.  An appellate court does not consider the underlying question of whether the verdict is against the weight of the evidence.  Rather, appellate review is limited to whether the trial court palpably abused its discretion in denying the claim.  **See Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013) ("Appellate review of a weight claim **is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence**") (citations omitted; original emphasis); **Commonwealth v. Stiles**, 143 A.3d 968, 980 (Pa. Super. 2016) (citation omitted; same without emphasis).
>
> Under the Rules of Criminal Procedure, a defendant must raise a claim that the verdict was against the weight of the evidence before the trial court: "(1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion."  The comment to Rule 607 emphasizes that "[t]he purpose of this rule is to make clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived."  **See** Pa.R.Crim.P. 607, *Comment*. Here, [Appellant] did not comply with Pa.R.Crim.P. 607.  He did not file any pre- or post-sentence motions concerning the weight of the evidence.  He also fails to identify any place in the record where a weight claim was preserved, as required by Pa.R.A.P. 2119(e).  Because a weight claim was never presented to the trial court, any instant claim challenging the weight of the evidence supporting the impersonating a public servant conviction would be waived and unreviewable.  **See Commonwealth v. Washington**, 825 A.2d 1264, 1265-66 (Pa. Super. 2003) (unpreserved weight of the evidence claim is waived).

_____

[18] Even after the Commonwealth pointed this ambiguity out, Appellant does not clarify on what basis he is challenging this conviction in his reply brief.

- 17 -

Alternatively, if this claim was a challenge to the sufficiency of the evidence, it would also be waived. A sufficiency claim does not need to be preserved in a claim presented to the trial court in order to be reviewed on appeal, however, such a claim has to be specifically identified in a statement of issues presented pursuant to Pa.R.A.P. 1925(b), or otherwise it is waived. ***See Commonwealth v. Garland***, 63 A.3d 399, 344 (Pa. Super. 2013) (noting that "[i]n [order] to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient," and holding that sufficiency claims that are not specifically identified in a Rule 1925(b) statement are waived). Here, [Appellant's] counterpart for the instant claim in his Rule 1925(b) statement only addresses whether the weight of the evidence was against the verdict for impersonating a public servant (Rule 1925(b) Statement, 4/3/19, ¶ 4(c)). Accordingly, he waived any related sufficiency challenge.

Commonwealth's Brief at 29-31 (some brackets added). Accordingly, we deem Appellant's second issue waived.

Nevertheless, even if not waived, we would conclude that the evidence was sufficient to sustain Appellant's conviction for impersonating a public servant. We apply the following standard of review:

A challenge to the sufficiency of the evidence is a question of law, subject to plenary review. When reviewing a sufficiency of the evidence claim, the appellate court must review all of the evidence and all reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, as the verdict winner. Evidence will be deemed to support the verdict when it establishes each element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. The Commonwealth need not preclude every possibility of innocence or establish the defendant's guilt to a mathematical certainty. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Teems*, 74 A.3d 142, 144-45 (Pa. Super. 2013) (citation

omitted).

With respect to the sufficiency of the evidence, the Commonwealth

advances:

> [Appellant's] attire … included a bullet-proof vest and accessories
> that would [have] given the impression to the average person that
> he was a law enforcement officer: a metal badge on a chain, a
> patch badge on his vest, a holstered gun, a supply of mace, and
> a set of handcuffs[.] (N.T. [at] 14-17, 25-27, 85; Commonwealth
> Exhibit 18). This attire by itself gave multiple trial witnesses the
> impression that [Appellant] was a police officer. For instance, the
> first responding police officer, Michael Carey, was sent to the
> scene in response to a report of a "gun shot [in which] an off-duty
> officer was involved" and, upon arriving at the scene, he had
> thought that [Appellant] was a police officer[.] (N.T. [at] 15-16)
> (noting that [Appellant] was "wearing all black" and that "it looked
> like a police uniform," and opining that he "thought [Appellant]
> was an officer"). Syreeta Manire, [the decedent's] girlfriend, also
> thought based on his attire that [Appellant] was a police officer[.]
> ([*Id.* at] 71) ("Q. Did you think he was a cop? A. When you first
> look at him, yeah. You would think he was a cop.").

> Moreover, defense witness Dominque Brown, who was the woman
> that [Appellant] was intending to pick up at the location of the
> shooting incident, also thought that [Appellant] was actually a
> police officer[.] ([*Id.* at] 152-[]53, 157) ("Q. And you thought he
> was a cop? A. I didn't know what he was. I told you I assumed
> that. So, I guess, thought in retrospect, I guess, yes.").

> While decked out in that vest and the accessories that would
> typically be worn by an on-duty police officer, [Appellant]
> proceeded to make statements to people at the shooting scene
> which either identified himself as a police officer or a law
> enforcement officer. Ms. Manire remembered him saying that he
> was a cop ([*Id.* at] 71) ("And I think he – well, I'm not going – if
> I'm not mistaken, 'cause it was so long, I believe he said he was
> a cop that night."). Ms. Brown recalled that [Appellant] identified
> himself as an "agent" to [the decedent]. ([*Id.* at] 140)
> ("[Appellant] said, "This is my uniform. I'm an agent. This is my
> uniform…[.] This is my nametag right here, and this is my

badge."). While "agent" may be considered a vague term, his simultaneous identification of himself as an "agent" while referring to his badge falsely suggested that he was a law enforcement officer (for instance, law enforcement officers of the Federal Bureau of Investigation are generally referred to as "agents"). Ms. Brown also told the police in a statement that [Appellant] had told [the decedent] that he was a "cop[.]" ([*Id.* at] 150-[]51) ("Q. [Appellant] was coming from work, and he is a police officer and he was in uniform; is that correct? A. Yes. Is that what you told the detective? A. Yes. Q. [Appellant] says to the guy in the car that he is a police officer; is that correct? A. Yes. Q. Did I read that right? A. Yes…[.] Q. Did I read that correctly, that [Appellant] said I am a cop? A. Yes. Q. Okay. So [Appellant] told the guy that he was a cop. A. Yes.").

In addition to wearing the attire of a police officer and identifying himself as a "cop" or an "agent," [Appellant] also acted as if he had the authority of a law enforcement officer. For instance, he ordered [the decedent], "Show me your hands," in their heated dispute[.] ([*Id.* at] 130). An order of that nature would typically be one made by a police officer during a traffic stop.

The combination of the attire and the self-identifications as a "cop" or an "agent" constituted the "falsely pretends to hold a position in the public service" element of Section 4912 and the order to [the decedent] to show his hands satisfied the *mens rea* element that [Appellant] had intended to induce [the decedent] "to submit to such pretended official authority." Viewed in the light most favorable to the Commonwealth, the evidence was amply sufficient to support [Appellant's] conviction for impersonating a public servant.

Commonwealth's Brief at 34-36. We would concur and conclude that the evidence was sufficient to support Appellant's conviction.

Further, we would also determine that Appellant's challenge to the weight of the evidence lacks merit. We apply the following standard of review to weight claims:

As a general rule, the weight of the evidence is exclusively for the fact finder who is free to believe all, part or none of the evidence and to determine the credibility of the witnesses. We cannot substitute our judgment for that of the finder of fact. We may

only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, our role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion.

*Commonwealth v. Castelhun*, 889 A.2d 1228, 1234 (Pa. Super. 2005) (internal citations and quotation marks omitted).

Though Appellant did not properly preserve his weight-of-the-evidence claim, the trial court nevertheless addressed it in its Rule 1925(a) opinion. *See* TCO at 22-26. We would conclude that the trial court did not abuse its discretion in denying it.[19] Accordingly, we would also reject Appellant's weight claim.

## Issue 3

Finally, in Appellant's last issue, he contends that the trial court "abused its discretion when it issued a sentence six times higher than the guidelines sentence, where [the trial court] expressly stated [that it] thought [Appellant] was guilty of a crime for which he had not been charged." Appellant's Brief at 12 (emphasis omitted). He claims that "[t]he present sentence reflects, not the charges which the trial court convicted [Appellant], but a charge never raised[, *i.e.*, homicide,] of which [the trial court] **wanted** to convict him." *Id.* (emphasis in original). Appellant says that "[t]his is an abuse of discretion,

_____

[19] Appellant complains that the trial court inappropriately referred to testimony from his mother that occurred at sentencing in disposing of his weight claim. However, such reference is of no moment, given that the evidence at trial strongly supported his conviction. *Accord* Commonwealth's Brief at 37 n.12.

as it shows [the trial court's] bias and prejudice against [him]." **Id.** (citation omitted).  Therefore, Appellant asks us to vacate his sentence and remand the case to a different judge for re-sentencing. **Id.**

Again, we deem this claim waived.  The Commonwealth properly notes:

Challenges to the discretionary aspects of a sentence are not appealable as of right. **Commonwealth v. Dempster**, 187 A.3d 266, 272 (Pa. Super. 2018) (*en banc*).  Rather, a defendant wishing to obtain appellate review of a discretionary sentencing claim must: (1) file a timely notice of appeal; (2) properly preserve the issue at sentencing or in a post-sentence motion to reconsider and modify the sentence; (3) comply with Pa.R.A.P. 2119(f), by including a separate section in their appellate brief setting forth "a concise statement of the reasons relief upon for allowance of appeal with respect to the discretionary aspects of a sentence[;]" and (4) present a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. [**Id.**] at 272.  "Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed." **Commonwealth v. Griffin**, 65 A.3d 932, 935 (Pa. Super. 2003).

Here, [Appellant] waived any discretionary sentencing claim because he raised no objections to the sentence after the imposition of the term at his sentencing hearing and then never filed any post-sentence motion requesting the reconsideration of his sentence; in particular, he made no assertion below that the trial court was biased against him. **Dempster**, 187 A.3d at 272; **Griffin**, 65 A.3d at 935; **see also** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal").  Additionally, his failure to include a separate section in his brief pursuant to Pa.R.A.P. 2119(f) provides a separate basis for finding his claim unreviewable. **See, e.g.**, **Commonwealth v. Weir**, 201 A.3d 163, 175 (Pa. Super. 2018) (finding [the] appellant's discretionary sentencing claim waived based on his noncompliance with Rule 2119(f)).

[Appellant] also failed to identify his specific theory for this claim in his statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b), and thus deprived this [c]ourt of a direct

response from the trial court. His instant claim challenges the discretionary aspects of his sentence by alleging that the trial court supposedly based its sentence on uncharged criminal conduct which [Appellant] regards [as] an improper sentencing factor, and exhibited bias against [Appellant]. In his Rule 1925(b) statement, however, [Appellant] only raised a general challenge to the length of his sentence as excessive (Rule 1925(b) Statement, 4/3/19, ¶ 4(a)). [Appellant] thus additionally waived this claim by not specifically identifying it in his Rule 1925(b) statement. *See Commonwealth v. Lemon*, 804 A.2d 34, 36-37 (Pa. Super. 2002) (waiver results from a Rule 1925(b) statement's omission of the specific theory raised on appeal).

Commonwealth's Brief at 12-14. We agree with the Commonwealth's analysis, and conclude that Appellant has waived this issue on multiple grounds. Thus, no relief is due on this claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/19/21