J-A11039-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TAYLOR BREANN ENTERLINE | : | |
| | : | |
| Appellant | : | No. 715 MDA 2023 |

Appeal from the Judgment of Sentence Entered April 4, 2023
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0004477-2020

BEFORE: BOWES, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:          **FILED: MAY 31, 2024**

Taylor Breann Enterline (Appellant) appeals from the judgment of

sentence imposed after a jury convicted her of one count each of riot, failure

to disperse upon official order, obstruction of highways, disorderly conduct,

and defiant trespass.[1] We affirm.

The trial court summarized the evidence presented at trial:[2]

> On September 13, 2020, Detective Stanley Roache served
> as the deputy commander of the Lancaster County Special
> Emergency Response Team ("SERT"). At approximately 6:45
> p.m., the members of the SERT team were instructed to meet at
> a location relative to an officer-involved shooting which had
> occurred in the City of Lancaster. The officers were advised that
> there was a growing crowd at the scene of the shooting and that

---

[1] 18 Pa.C.S.A. §§ 5501(1), 5502, 5507(a), 5503(a)(1), 3503(b)(1)(i).

[2] The trial court noted "much of the evidence was presented by way of video
recordings from surveillance cameras and other sources." Trial Court Opinion,
7/17/23, at 3 n.8.

the crowd was becoming increasingly more agitated. While in transit to the scene, the officers were advised that the crowd was moving toward the headquarters of the Lancaster City Bureau of Police, which is located near the intersection of West Chestnut Street … and North Prince Street … in the City of Lancaster. Accordingly, the officers were rerouted to provide security at the police station. Detective Roache and his team arrived at the station at approximately 7:00 p.m. At the time of his arrival, there was only a limited crowd gathered near the station. Detective Roache made efforts to secure the location with the limited number of law enforcement officers present. Officers were stationed at the front of the building, to the rear of the building, and on a public ramp that runs adjacent to the building.

Throughout the evening, the crowd continued to grow. Officers estimated the crowd size between 250 to 500 people in the vicinity of the station. The crowd was spread throughout many areas around the police station, blocking the adjacent intersection and roadways. Many members of the growing crowd began to gather on the ramp and attempt to move closer and closer to the officers stationed to the rear of the building. The officers [established] a phase line on the ramp, which [designated a position the officers determined they could not allow the protestors to reach without compromising,] the security of the police station…. At this time, there were approximately twenty to thirty law enforcement officers present. Numerous verbal [police] orders indicating that this was an unlawful assembly and to disperse were given to the crowd by means of the public address system of a police cruiser parked on the ramp.

When the protestors began to encroach on the phase line, multiple chemical munitions were deployed by law enforcement in an effort to disperse the crowd and preserve the security of the police station. Upon the initial deployment of the munitions, the crowd retreated approximately ten feet, regrouped, and advanced again. Eventually, law enforcement officers advanced forward in a line while deploying additional munitions. When successful in pushing the crowd to the bottom of the ramp, the officers retreated to the rear of the station. Again, the large crowd regrouped and moved up the ramp. At this point, the protestors attempted to barricade the officers into the police station using barricades and available debris. Throughout this time, the crowd, from multiple locations, threw numerous items at the officers, including bottles, rocks, frozen water bottles, bricks, and

fireworks. In addition, officers described the scene as being of a loud nature, stemming from actions including yelling, chanting, banging of items, and bottles crashing.

At approximately 2:30 a.m., members of the crowd pushed a large dumpster into the middle of the intersection of North Prince Street and West Chestnut Street and lit a large fire in the dumpster.

Around 3:00 a.m., law enforcement sent out arrest teams to arrest any remaining protestors. Law enforcement had not done so earlier due to a lack of manpower and resources in comparison to the assembled crowd.

By 6:00 a.m., members of the Lancaster City Fire Department were working to extinguish the dumpster fire. In addition, most of the police station windows had been smashed, windows across the street at a post office had been smashed, most of the windows on North Prince Street had been smashed, and large debris and rocks [were] strewn about the area. After cleaning efforts were completed …, the roadways were reopened to the public.

During the entirety of this event, normal police operations in the City of Lancaster were brought to a standstill. No traffic was able to pass through West Chestnut Street. In total, the effects of this unlawful, unpermitted assembly lasted over ten hours.

Trial Court Opinion, 7/17/23, at 3-5 (record citations and footnote omitted).

The trial court described the evidence of Appellant's role in the incident:

With respect to Appellant, it is essentially impossible to have been present in the vicinity of the police station that night and unaware of her presence. From her arrival at the police station at or around 8:00 p.m., Appellant thrust herself into the forefront of the crowd. Even before she acquired a megaphone, Appellant's voice could be heard ringing throughout the crowd, chanting[,] "No Justice! No Peace!" as she marched to the end of West Chestnut Street that intersects North Prince Street. There, she joined a group of protestors sitting on the crosswalk[,] blocking traffic from driving down West Chestnut Street in front of the police headquarters[. There, Appellant] was handed a megaphone.

Megaphone now in hand, Appellant again took it upon herself to lead the chants of the crowd[, which] at this point began its digression into an unruly mob. [Appellant's chants included] "No Justice! No Peace!" … "Fuck the Police!" … "Fuck 12!" … [and] "No racist ass police!" …. Appellant walked back along West Chestnut Street with the megaphone, her chants invigorating the crowd that called back in response, as members of the mob smashed the windows of the police station[,] before [Appellant] returned to the end of West Chestnut Street to aid in its blockade.

Later, after the mob migrated to the very bottom of the police station ramp, Appellant left her position on the ramp's base in front of the mob, climbed up on the cement barrier lining the ramp, and began to orchestrate the verbal mantras of the crowd once again from her perch. Screaming into the megaphone as the crowd advanced up the ramp, Appellant changed from the more abstract calls for action to literal [calls for action], screaming, "What do we want?!" … "Justice!" replied the mob…. "When do we want it?!" [Appellant] called back … "Now!" cheered the mob…. "And if we don't get it?! … Shut it down!" Appellant shouted, met with cheers from the mob. At trial, Appellant explained that she was referring to the police system of Lancaster [when she said] "shut it down."

Appellant then joined the mob as it advanced up the ramp, despite the numerous orders to disperse…. She marched with the mob up the police's phase line, at which point the mob was met with chemical and smoke ordnances from police to push them back down the ramp. After an initial, momentary retreat by the mob, it once again charged to the previous line of advancement, Appellant among them. Appellant donned goggles as she marched with the mob through the police's first deployment of chemical ordnances. Defiant, Appellant exclaimed, "We're not going anywhere[,]" just before the mob was met with another wave of chemical and smoke ordnances pushing them down the ramp, this time with the police advancing toward the crowd to ensure dispersion. The mob in retaliation rained down a consistent volley of bricks, bottles, and other hard debris upon the officers. Appellant remained on the ramp as this hail of debris flew overhead[,] until the officers successfully dispersed the entire mob from the ramp onto the street.

Despite being pushed off the ramp and down West Chester Street to the intersection… , much of the mob, including Appellant,

- 4 -

did not disperse from the area. [Video evidence showed] Appellant in [the] street at or around 2:24 a.m.[,] near an on-fire dumpster [that] the mob had placed in the intersection to obstruct traffic…. In fact, Appellant never dispersed, and her part in the riot only came to an end when she was arrested sometime before 3:00 a.m.

*Id.* at 5-7 (record citations omitted).

On January 19, 2023, following a three-day trial, a jury convicted Appellant of the above-described offenses.[3] On April 4, 2023, the trial court imposed an aggregate sentence of three years of probation and ordered Appellant to pay $7,068.17 in restitution and complete 125 hours of community service. Appellant filed a timely post-sentence motion, challenging the weight and sufficiency of the evidence underlying her convictions of riot and disorderly conduct. The trial court denied the motion, and Appellant timely appealed. Appellant filed a timely concise statement of matters complained of and the trial court filed an opinion under Pa.R.A.P. 1925.

Appellant presents the following questions for our review:

I. Was the evidence sufficient to prove that [Appellant] had the necessary specific intent and engaged in the required activity to sustain her convictions for riot and disorderly conduct?

II. Was [the] verdict against the weight of the evidence where all [Appellant's] fact witnesses testified that she never engaged in violent or destructive behavior?

Appellant's Brief at 4.

---

[3] The jury acquitted Appellant of one count of criminal conspiracy to commit riot, 18 Pa.C.S.A. § 903(a)(1).

In her first issue, Appellant challenges the sufficiency of the evidence underlying her convictions for riot and disorderly conduct. Before reaching the merits, we must consider whether Appellant has preserved this issue for our review. Rule 1925(b) provides that an appellant's concise statement "shall concisely identify each error that the appellant intends to assert with sufficient detail to be raised for the judge." Pa.R.A.P. 1925(b)(4)(ii). Issues not raised in accordance with this provision are waived. *Id.* (b)(4)(vii).

> In order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient. Such specificity is of particular importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt.

*Commonwealth v. Stiles*, 143 A.3d 968, 982 (Pa. Super. 2016) (citations and quotation marks omitted). A trial court's "review and legal analysis can be fatally impaired when the court has to guess at the issues raised. Thus, if a concise statement is too vague, the court may find waiver." *Commonwealth v. Hansley*, 24 A.3d 410, 415 (Pa. Super. 2011) (citations omitted).

Here, Appellant's concise statement failed to specify the elements of riot or disorderly conduct she claims were not supported by sufficient evidence. Rule 1925(b) Statement, 6/6/23, ¶ 1. The trial court opined Appellant's first issue should be deemed waived for her failure to comply with Rule 1925(b). Trial Court Opinion, 7/17/23, at 9-10. The trial court nevertheless discussed

the issue, though it did not directly address the particular aspects of the sufficiency claim Appellant now raises before this Court. *See id.* at 10-15.[4] We conclude Appellant's concise statement failed to identify her first issue with sufficient detail to enable effective review. *Stiles*, 143 A.3d at 982. Therefore, the issue is waived. *Id.*; *see also* Pa.R.A.P. 1925(b)(4)(iv).

Even if not waived, we would conclude the issue lacks merit. When reviewing a sufficiency claim, this Court

> must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Martin*, 297 A.3d 424, 434 (Pa. Super. 2023) (citation omitted).

Appellant argues she lacked the intent to commit disorderly conduct. Appellant's Brief at 12-16. She maintains she intended to protest peacefully and had not intent "to cause public inconvenience, annoyance or alarm." *Id.* at 15 (quoting 18 Pa.C.S.A. § 5503(a)(1)).

---

[4] As presented on appeal, Appellant's first issue is not specific. She identifies the element of "specific intent," but adds the phrase "and engaged in the required activity," which vaguely encompasses all other elements. Appellant's Brief at 4. Her argument is not limited to intent, but also contests other elements of disorderly conduct. *See id.* at 16-17.

"A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he … engages in fighting or threatening, or in violent or tumultuous behavior." 18 Pa.C.S.A. § 5503(a)(1). Where, as here, disorderly conduct is graded as a misdemeanor of the third degree, the Commonwealth must also prove the defendant either intended "to cause substantial harm or serious inconvenience" or "persist[ed] in disorderly conduct after reasonable warning or request to desist." *Id.* § 5503(b).

Disorderly conduct under Section 5503(a)(1) does not require specific intent to "cause public inconvenience, annoyance or alarm," but can be sustained by proof that the defendant "recklessly creat[ed] a risk thereof." 18 Pa.C.S.A. § 5503(a)(1).

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

*Id.* § 302(b)(3). Appellant does not dispute that she recklessly created a risk of public inconvenience. Further, viewing the evidence in the light most favorable to the Commonwealth, the Commonwealth presented sufficient evidence that Appellant recklessly created a risk of public inconvenience. *See*

Trial Court Opinion, 7/17/23, at 5-7 (summarizing evidence of Appellant's unruly actions).[5]

Appellant also argues the Commonwealth failed to prove she engaged in "fighting or threatening, or in violent or tumultuous behavior." Appellant's Brief at 16 (quoting 18 Pa.C.S.A. § 5503(a)(1)). Appellant asserts the Commonwealth "possessed hundreds of hours of video [of the incident], yet not one clip captured [Appellant engaging] in violent or anti-social behavior." *Id.* at 16.

Disorderly conduct does not require violent behavior, and Appellant fails to address whether she engaged in "tumultuous" behavior. As this Court has observed,

> "tumultuous" is defined as "marked by tumult"; "tending or disposed to cause or incite a tumult"; or "marked by violent or overwhelming turbulence or upheaval." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1272 (10th ed. 1996). "Tumult" is relevantly defined as "a disorderly agitation ... of a crowd usu[ally] with uproar and confusion of voices," or "a violent outburst." *Id.* at 1271–72.

_____

[5] Appellant further maintains she did not specifically intend "to cause substantial harm or serious inconvenience." Appellant's Brief at 15. Disorderly conduct's misdemeanor grading does not require specific intent to "to cause substantial harm or serious inconvenience," but can be sustained by proof that the defendant "persist[ed] in disorderly conduct after reasonable warning or request to desist." 18 Pa.C.S.A. § 5503(b). Appellant fails to address whether she persisted in her conduct after a reasonable request to desist. Our review discloses the Commonwealth presented sufficient evidence that police issued numerous requests for the crowd to desist, and Appellant ignored those requests. *See* N.T., 1/18/23, at 216, 331.

*Commonwealth v. Love*, 896 A.2d 1276, 1285 (Pa. Super. 2006). Viewing the evidence in the light most favorable to the Commonwealth, our review discloses the Commonwealth presented sufficient evidence that Appellant engaged in tumultuous behavior. *See* Trial Court Opinion, 7/17/23, at 5-7. For these reasons, Appellant's sufficiency claim as to the charge of disorderly conduct, even if not waived, lacks merit.

Appellant's challenge to the sufficiency of the evidence underlying her riot conviction is based solely on the fact that disorderly conduct is a predicate to riot. Appellant's Brief at 17; *see* 18 Pa.C.S.A. § 5501(1) ("A person is guilty of riot … if he participates with two or more others in a course of disorderly conduct … with intent to commit or facilitate the commission of a felony or misdemeanor.").[6] Because Appellant's disorderly conduct challenge fails, her riot claim must also fail. Appellant's first issue warrants no relief.

In her second issue, Appellant argues her convictions of riot and disorderly conduct were against the weight of the evidence. Appellant's Brief at 17-19. Our standard of review of a weight claim is well settled:

> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a reassessment of the

---

[6] The Commonwealth alleged Appellant participated with others in a course of disorderly conduct with intent to commit or facilitate the crime of failure to disperse upon official order. *See* Amended Information, 1/17/23, Count 1; *see also* 18 Pa.C.S.A. § 5502 (failure to disperse upon official order is a misdemeanor of the second degree).

- 10 -

credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Williams*, 255 A.3d 565, 580 (Pa. Super. 2021) (citation omitted). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of evidence…." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citation omitted).

Appellant argues the verdict was against the weight of the evidence because she "protested peacefully" and presented "ample credible evidence" of her peaceful intent. Appellant's Brief at 17-18. Appellant highlights the evidence she adduced at trial, including Appellant's own testimony that her protesting "was always about being peaceful, being able to start those conversations[,] but also to be able to voice the pain and hurt that many of us were feeling and are feeling." *Id.* at 18 (quoting N.T., 1/19/23, at 378). Appellant points to three witnesses' testimony that they were present at the protest and did not see Appellant throw or break anything.[7] *Id.* (citing N.T.,

_____

[7] Two of the witnesses present at the protest admitted they saw Appellant there only briefly, and all three acknowledged the video evidence provided the best means to determine what happened. N.T., 1/18/23, at 315, 320, 332.

1/18/23, at 314-15, 318, 329). These witnesses testified that Appellant had behaved peacefully at previous protests and that her goal "was to bring people together." *Id.* (quoting N.T., 1/18/23, at 318, 328). Appellant also notes testimony from multiple college professors who spoke to her good character. *Id.* at 18-19 (citing N.T., 1/18/23, at 337-39; N.T., 1/19/23, at 353-67).

Appellant's weight argument bears little relation to the elements of the crimes at issue. She was not charged with throwing or breaking anything. Appellant insists she had "peaceful" intent but, as set forth above, the charges carry no requirement that she act with violent intent. Rather, disorderly conduct requires only that Appellant intend or recklessly create the risk of public inconvenience. 18 Pa.C.S.A. § 5503(a)(1). The crime of riot requires only that Appellant participate "with two or more others in a course of disorderly conduct … with intent to commit or facilitate the commission of" the crime of failure to disperse upon official order. *Id.* § 5501(1). Appellant was convicted of failure to disperse and does not argue she lacked intent to commit that offense. Her professions of "peaceful" intent, even if believed by the factfinder, do not refute the intent or recklessness elements of disorderly conduct or riot.

We discern no abuse of discretion in the trial court's conclusion that the jury's verdict did not shock its conscience. Accordingly, Appellant's weight claim fails.

Judgment of sentence affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/31/2024